KELLEY PROPERTY DEVELOPMENT, INC., ET AL. *v.*
TOWN OF LEBANON ET AL.
(14640)

PETERS, C. J., CALLAHAN, BORDEN, BERDON, NORCOTT,
KATZ and SANTANIELLO, Js.[1]

[1] This case was orally argued on February 10, 1993, before a court of five justices consisting of Chief Justice Peters and Justices Callahan, Borden, Berdon and Katz. The court subsequently determined that the case should be considered en banc. Pursuant to Practice Book § 4112, Justices Norcott and Santaniello were added to the court and considered the case upon full review of the record, briefs and transcript of the oral argument.

Argued February 10—decision released July 6, 1993

*Timothy S. Hollister,* with whom was *Gregory T. D'Auria,* for the appellants (plaintiffs).

*Stephen P. Fogerty,* with whom were *Juri E. Taalman* and *Mary Driscoll,* for the appellees (named defendant et al.).

*Michael G. Durham,* for the appellee (defendant Edward Tytor).

PETERS, C. J. The principal issue in this civil rights appeal is whether the Connecticut constitution affords a monetary remedy for damages to persons whose state due process rights have allegedly been violated by local zoning officials. The plaintiffs, Kelley Property Development, Inc., and John J. Kelley, Sr. (collectively, Kelley), sought compensatory and punitive damages for injuries allegedly resulting from the defendants'[2] denial

---

[2] The defendants are the town of Lebanon; the Lebanon planning and zoning commission; Harold Liebman, James Abell, Robin Chesmer, Oliver Manning, Raymond Manning and Richard Dexter, who were, at all times relevant to this case, members of the Lebanon planning and zoning commission; and Edward Tytor, who was, at all times relevant to this case,

of Kelley's subdivision application. Kelley asserted claims pursuant to 42 U.S.C. § 1983 alleging the defendants' violation of his federal substantive and procedural due process rights,[3] as well as claims pursuant to the state constitution alleging the defendants' violation of his state substantive and procedural due process rights.[4] The trial court, *Austin, J.,* granted summary judgment in favor of the defendants.[5] Kelley appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm.

The record of the findings of fact by the trial court and the stipulation of the parties contains the following relevant facts. In September, 1988, Kelley purchased a 573 acre tract of land (property) located in the towns of Lebanon and Colchester. Although the

an alternate member of the Lebanon planning and zoning commission. We will refer to the defendants collectively as the defendants or individually as Lebanon, commission, commission members and Tytor, respectively. The commission members and Tytor were sued in their individual and official capacities. Finally, before the trial court's decision, Kelley withdrew his claims against Patricia Parry, an alternate commission member at all times relevant to this case.

[3] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[4] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[5] The summary judgment in favor of the defendants did not specifically apply to the defendant Tytor, who had moved separately for summary judgment. Rather, the memorandum of decision noted that the court had not yet acted on Tytor's summary judgment motion. Tytor moved for an articulation, seeking to confirm that the judgment applied to him, but the motion was denied.

Tytor represented in this court, however, that the trial court clerk had informed him that the trial court was considering a request for reconsideration of the motion to articulate. For the purpose of this appeal, we will assume that the summary judgment was rendered in favor of Tytor as well as the other defendants.

commission initially rejected Kelley's request to meet informally to discuss his development plans, Kelley presented several development proposals to the commission in January, 1989. The commission endorsed a cluster housing proposal, which would require amendment of the subdivision regulations. In February, 1989, Kelley forwarded proposed amended regulations to the commission. In March, 1989, the commission met to discuss the proposed regulations and held a public hearing on them. In April, 1989, Kelley decided to abandon the cluster housing proposal and instead to pursue a more traditional residential subdivision that would accord better with expressed public opinion regarding the development of Kelley's property.[6] In May, 1989, Kelley submitted an "Application For Approval Of A Subdivision Plan." Kelley's application included an area of open space that exceeded the commission's regulatory minimum size requirement. In July, 1989, the commission voted to deny Kelley's application, but later rescinded that denial when Kelley advised the commission that the denial was null and void because it had been issued before the commission had received a report from the inland wetlands commission. In August, 1989, the commission received a report from its planning consultant regarding the application's compliance with subdivision regulations and outstanding issues that needed to be resolved before the application could be approved. After holding public hearings on the application in September, 1989, the commission sought a legal opinion from its attorney advising whether property zoned industrial could properly form part of the open space reservation for a residential subdivision. After receiving its attorney's legal opinion and a letter from Kelley's attorney expressing disagree-

---

[6] Also in April, 1989, the commission reviewed a proposal to place a moratorium on subdivisions within lake districts, which presumably would have applied to Kelley's proposed subdivision. The commission decided not to pursue a moratorium in May, 1989.

ment with that opinion, the commission denied Kelley's application on November 29, 1989, because of an insufficient area of dry land in the proposed open space reservation.[7]

In December, 1989, Kelley filed a timely zoning appeal from the commission's denial to the trial court, *J. Walsh, J.,*[8] pursuant to General Statutes § 8-8. On January 14, 1991, Judge Walsh sustained Kelley's appeal on the ground that the commission's denial of his application had been an abuse of discretion because the applicable regulation did not permit a distinction between wet and dry land in proposed open space.[9] Judge Walsh also determined that the applicable regulation was not reasonably precise and, therefore, could not be used to deny Kelley's application. Without appealing from Judge Walsh's decision, the commission approved Kelley's subdivision application on February 13, 1991.

Kelley thereafter filed this action seeking damages for losses incurred as a result of the delayed approval of his application. In count one of his six count second amended complaint, Kelley alleged that his interest in

[7] Neither the trial court that heard Kelley's zoning appeal nor the trial court in the present case found that the commission had inappropriately delayed its decision on Kelley's subdivision application.

[8] We will refer hereinafter to the trial court that heard the administrative appeal as Judge Walsh, so as to reserve the term "trial court" for the court in which the present damages action originated.

[9] Judge Walsh's decision also adverted to an additional, albeit related, consideration mentioned by the commission in denying Kelley's application: the location of part of the open space in an area zoned industrial, whereas the subdivision itself was located in an area zoned residential. Judge Walsh's decision, as well as that of the trial court, however, focused primarily on the commission's consideration of the area of dry land within the open space in concluding that the commission abused its discretion. Accordingly, for the purpose of this decision, we will refer to the commission's reason for denying Kelley's application as the insufficient area of dry land within the open space proposal, rather than the industrial or residential location of the open space.

approval of his subdivision application was a property interest protected by the due process clause of the fourteenth amendment to the federal constitution, and that the defendants had violated the substantive guarantees of that provision by, inter alia, intentionally depriving Kelley of fundamentally fair procedures, misleading Kelley, ignoring the advice of consultants and arbitrarily denying his application. Kelley contended that, in light of these substantive due process violations, he was entitled to damages under § 1983. In count two, Kelley claimed damages under § 1983 because of the defendants' alleged violation of federal procedural due process guarantees in failing adequately to provide notice to Kelley of their actions regarding his application and in committing other procedural irregularities. Count three alleged the violation of Kelley's federal substantive and procedural due process rights by the commission members and Tytor in their individual capacities and sought punitive damages. Counts four, five and six of the second amended complaint asserted state constitutional claims that essentially mirrored the federal claims alleged in counts one, two and three, respectively.

After the pleadings had been closed, the trial court granted the defendants' motion for summary judgment on all six counts.[10] As to the federal claims, the trial court concluded that Kelley's claims were insufficient as a matter of law because Kelley did not meet the threshold requirement of possessing a property interest in approval of his subdivision application. As to the state claims, the trial court held that Kelley could not prevail because, even if the state constitution's due process provision affords broader protection than does the federal constitution's due process provision, violations of the Connecticut constitution cannot be redressed through a cause of action for damages in the absence of prior statutory or common law recognition of such an action.

[10] See footnote 5.

On appeal, Kelley claims that the trial court improperly: (1) rejected his federal due process claims on the ground that he did not have a protected property interest in approval of his subdivision application; and (2) held that no damages remedy exists for the defendants' alleged violations of his state constitutional due process rights.[11] We disagree with both of these contentions.[12]

[11] Kelley also contends that the trial court improperly held that a due process claim under the state constitution must meet the strict threshold requirement of a "protected property interest" as that requirement is defined by the "clear entitlement" test adopted by the United States Court of Appeals for the Second Circuit and this court for federal due process claims. See *RRI Realty Corporation* v. *Incorporated Village of Southampton,* 870 F.2d 911, 918 (2d Cir.) (to state a prima facie federal due process claim in a land regulation case, the plaintiff must establish a constitutionally protected property interest in approval of the application at issue by demonstrating a "clear entitlement" to approval, or a certainty or very strong likelihood of approval), cert. denied, 493 U.S. 893, 110 S. Ct. 240, 107 L. Ed. 2d 191 (1989); *Carr* v. *Bridgewater,* 224 Conn. 44, 51–52, 616 A.2d 257 (1992) (same). Kelley argues that the test for measuring the existence of a protected property interest under the state constitution should be broader than the federal standard. Specifically, Kelley urges a standard under which the ownership of the property or the right to develop the property for legitimate uses would be sufficient to establish a constitutionally protected property interest. See, e.g., *Del Monte Dunes* v. *Monterey,* 920 F.2d 1496, 1508 (9th Cir. 1990) (assuming that the plaintiff's ownership of the subject property constituted a constitutionally protected property interest); *Bello* v. *Walker,* 840 F.2d 1124, 1127–30 (3d Cir.) (same), cert. denied, 488 U.S. 851, 109 S. Ct. 134, 102 L. Ed. 2d 107 (1988).

The defendants assert, however, that the trial court did not decide that the "clear entitlement" test applies in state constitutional due process claims, but merely assumed, because of a concession by Kelley, that the federal standard applied. Moreover, the defendants claim, as to the merits of Kelley's argument, that the federal "clear entitlement" standard is appropriate under the state constitution because of the similarity of the state and federal constitutional due process provisions.

We need not, however, resolve the parties' dispute as to either the trial court's decision on this issue or the appropriate standard by which to assess a claimant's property interest, in light of our holding that the alleged violation of Kelley's state constitutional due process rights may not be redressed through a cause of action for damages. The issue regarding the existence of a damages cause of action analytically precedes the issue regarding whether a particular claimant has successfully asserted that cause of action.

[12] Because we affirm the trial court on the grounds on which that court relied, we need not address the defendants' alternative grounds for affir-

## I

Kelley first claims that his interest in the approval of his subdivision application was a property interest protected by the federal constitution and, therefore, that the trial court improperly rejected his federal due process claims on the ground that he had no constitutionally protected interest.[13] We are not persuaded.

## A

This court recently adopted the Second Circuit Court of Appeals' "clear entitlement" test as a guide to determining whether a civil rights claimant in a land regulation case has stated a due process claim under the federal constitution. See *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 738–39, 610 A.2d 1238 (1992), citing *RRI Realty Corporation* v. *Incorporated Village of Southampton*, 870 F.2d 911, 915–18 (2d Cir.), cert. denied, 493 U.S. 893, 110 S. Ct. 240, 107 L. Ed. 2d 191 (1989). The "clear entitlement" test mandates

mance. Those alternative grounds are: (1) Kelley's procedural due process claim fails because he had the right to appeal from the denial of the application and did, in fact, successfully appeal; (2) Kelley's substantive due process claim fails because he has not alleged sufficient facts to establish the requisite "nature and degree of misconduct" by the defendants; (3) the defendants are shielded from personal liability by qualified immunity; and (4) the defendants are immune from liability under General Statutes § 52-557n (b) (7). Moreover, Tytor individually urged one additional alternative ground for affirmance of the summary judgment rendered as to him: no causal link exists between Tytor's actions and the commission's denial of Kelley's application.

[13] Kelley also claims that the trial court's summary resolution of the issue of whether he possessed a property interest protected under the federal constitution was improper because that issue requires a factual inquiry into the nature of Kelley's application and the context in which the commission acted on that application. As we held in *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 740, 610 A.2d 1238 (1992), however, "the question of whether [a land use] applicant has a property interest is normally a matter of law." Accordingly, the trial court's summary resolution of that issue was proper.

the possession of a constitutionally protected property interest as a threshold requirement for a successful substantive or procedural federal due process claim.[14] See *RRI Realty Corporation* v. *Incorporated Village of Southampton,* supra, 915–17; but see *Bello* v. *Walker,* 840 F.2d 1124 (3d Cir.), cert. denied, 488 U.S. 851, 109 S. Ct. 134, 102 L. Ed. 2d 107 (1988). If a claimant does not establish a constitutionally protected interest, the due process analysis ceases because no process is constitutionally due for the deprivation of an interest that is not of constitutional magnitude. If, however, a due process claimant does establish a constitutionally protected interest, he or she may then seek to establish other required elements of the due process claim, such as reliance on inappropriate procedures or arbitrary or oppressive conduct. See generally *Zinermon* v. *Burch,* 494 U.S. 113, 127–28, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990) (procedural due process); *Daniels* v. *Williams,* 474 U.S. 327, 331–32, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986) (substantive due process).

The "clear entitlement" test asks whether there is a certainty or a very strong likelihood that the application in question would have been granted, but for the wrongful conduct of the local officials. *RRI Realty Corporation* v. *Incorporated Village of Southampton,* supra, 915–17; see also *Board of Regents* v. *Roth,* 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); *Yale Auto Parts, Inc.* v. *Johnson,* 758 F.2d 54, 59 (2d Cir. 1985).

[14] Although both the Second Circuit and this court have applied the "clear entitlement" test primarily in cases involving substantive due process claims; see, e.g., *RRI Realty Corporation* v. *Incorporated Village of Southampton,* 870 F.2d 911, 916–17 (2d Cir.), cert. denied, 493 U.S. 893, 110 S. Ct. 240, 107 L. Ed. 2d 191 (1989); *Red Maple Properties* v. *Zoning Commission,* 222 Conn. 730, 739, 610 A.2d 1238 (1992); that test applies with equal force in procedural due process cases. Indeed, the United States Supreme Court case in which the "clear entitlement" test originated is *Board of Regents* v. *Roth,* 408 U.S. 564, 576–78, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972), a procedural due process case. Accordingly, we apply the "clear entitlement" test to Kelley's federal substantive and procedural due process claims.

A very strong likelihood means not simply a high probability of approval, but rather a virtual assurance of approval because any discretion is narrowly circumscribed. See *Red Maple Properties* v. *Zoning Commission,* supra, 737–38. "Application of the ['clear entitlement'] test must focus primarily on the degree of discretion enjoyed by the issuing authority, not on the estimated probability that the authority will act favorably in a particular case." (Internal quotation marks omitted.) Id., 739; see *Carr* v. *Bridgewater,* 224 Conn. 44, 52, 616 A.2d 257 (1992).

B

In this case, the trial court properly held that Kelley's subdivision application was subject to the commission's discretion and that the Lebanon land use regulations, therefore, did not clearly entitle Kelley to approval. The relevant Lebanon subdivision regulation, which addresses open space requirements and which served as the basis for the denial of Kelley's application, provides: "The minimum area of open space shall be 10% of the total area of the land to be subdivided whether or not it is to be so subdivided entirely at the time of application. Generally such dedication shall not be less than one acre and shall be of such size and location as deemed appropriate by the Commission." Lebanon Subdivision Regulation § 6.8B.[15]

---

[15] The full text of Lebanon Subdivision Regulation § 6.8 provides:

"A. Dedication—The Commission may require dedication of land as open space, parks and playgrounds in a subdivision when it deems that such land will conserve natural or scenic resources; protect natural streams, marshes, and groundwater tables; supplement existing open space and recreational areas; meet recreational needs of present and projected population in the area; save historic sites, wildlife sanctuaries, and outstanding forests; preserve ridges, ravines, ledge outcroppings, and other unusual physical features; or promote orderly community development.

"B. Area—The minimum area of open space shall be 10% of the total area of the land to be subdivided whether or not it is to be so subdivided entirely

Although Kelley acknowledges the applicability of the "clear entitlement" test to his federal claims, he argues that the trial court applied the test improperly to determine that § 6.8B gives the commission discretion to deny an application on the basis of its proposed open space reservation even if the application meets the other regulatory requirements.[16] Kelley asserts that he meets the "clear entitlement" test because, according to Judge Walsh's interpretation of that section, the commission had no discretion as to what comprised open space. Because the defendants did not seek further appellate review of the judgment in the administrative appeal, Kelley argues that Judge Walsh's construction of the regulation must be given res judicata effect in this proceeding. The defendants contend, on the other hand, that the trial court properly determined that, even under Judge Walsh's construction of the regulation, Kelley was not clearly entitled to approval of his application.

at the time of application. Generally such dedication shall not be less than one acre and shall be of such size and location as deemed appropriate by the Commission.

"C. Standards—Such open space shall have access from a public street, with such access at least 20 [feet] wide and having a maximum grade of 15%, or shall abut existing open space having such access. Any land to be dedicated as public open space shall be left in its natural state by the subdivider, except for improvements as may be required by the Commission, and shall not be graded, cleared, or used as a repository for stumps, brush, earth, building materials, or debris. However, open space for parks and playgrounds shall be provided in a condition suitable for the purpose intended. The Commission may require such open space [to] be graded by the subdivider to properly dispose of surface water, that it be seeded with field grass, and that all brush and debris be removed. Such improvement of open spaces will not be required until subdivision is substantially completed."

[16] Although the defendants denied the allegation in Kelley's second amended complaint that his subdivision application had "conformed in all respects with applicable regulations," the commission did approve the application after Kelley's successful administrative appeal. For the purpose of this appeal, we need not resolve the question whether the application did, in fact, conform to all applicable regulations other than the discretionary portion of the open space provision.

We agree with the defendants. Judge Walsh's decision disapproved the commission's denial of Kelley's application for two reasons: (1) the denial was an arbitrary application of the zoning regulations and an abuse of discretion; and (2) § 6.8B is "not reasonably precise nor sufficient to give 'those affected by [a] decision notice of their rights and obligations.' " On this record, it is not clear whether Judge Walsh merely held the commission's application of the regulation to be an abuse of discretion in this case or invalidated the regulation itself. We conclude, however, that whether Judge Walsh's decision is read to invalidate merely the commission's use of § 6.8B in this case[17] or to invalidate that provision as impermissibly vague,[18] Kelley did not have a clear entitlement to approval of his subdivision application.

## 1

If we construe Judge Walsh's decision as holding merely that the commission abused its discretion, Kelley was not clearly entitled to approval because, at the time his application was filed, the commission nonethe-

[17] The relevant portion of Judge Walsh's memorandum of decision states: "Nowhere in these regulations does it state than open space consist of only dry land nor does it state that the land to be dedicated be contained within a residentially zoned area. However, the defendant Commission contends section 6.8B which provides that the land must be such that it is 'deemed appropriate by the Commission' gives them broad discretion to deny plaintiff's application. Denial of plaintiff Kelley's application for subdivision on this basis is an arbitrary application of defendant Planning and Zoning Commission's zoning regulations. . . .

"The section of the regulations allowing defendant Planning and Zoning Commission to determine whether open space land is appropriate is not reasonably precise nor sufficient to give 'those affected by its decision notice of their rights and obligations.' [*Sowin Associates* v. *Planning & Zoning Commission,* 23 Conn. App. 370, 376, 580 A.2d 91 (1990), cert. denied, 216 Conn. 832, 583 A.2d 131 (1991)]. The defendant Planning and Zoning Commission cannot use this part of the regulations to deny plaintiff's application."

[18] The trial court interpreted Judge Walsh's decision as invalidating § 6.8B of the Lebanon Subdivision Regulations.

less had discretion that it could have exercised properly to deny the application. Section 6.8B, by its plain language, gives the commission discretion as to the size and location of open space proposed in a subdivision application. The relevant portion of § 6.8B states: *"Generally, such dedication [of open space] shall not be less than one acre and shall be of such size and location as deemed appropriate by the Commission."* (Emphasis added.) This language, particularly the highlighted portions, authorizes the commission to make discretionary decisions on subdivision applications depending on the open space proposal. It refutes Kelley's argument that a contrary conclusion would require resort to a broadly worded phrase taken out of context.

Kelley contends, however, that the Second Circuit's decision in *Sullivan* v. *Salem,* 805 F.2d 81 (2d Cir. 1986), holds that an agency's abuse of discretion in denying an application necessarily requires a conclusion that the applicant had a clear entitlement to approval. In *Sullivan* v. *Salem,* supra, 83, town officials had denied the plaintiff's application for certificates of occupancy for newly constructed houses on the ground that the newly constructed road adjacent to the houses had not yet been accepted for dedication. The applicable regulations, however, did not contain any reference to road acceptance and, in fact, gave town officials "no element of discretion" except to the extent that they were obligated to determine whether the construction for which a certificate of occupancy was requested complied with the relevant state and municipal requirements. Id., 85. The Second Circuit held, therefore, that the plaintiff would have a protected property interest in approval of his application if the houses fully conformed to all other requirements.[19]

---

[19] The trial court in *Sullivan* v. *Salem,* 805 F.2d 81, 85 (2d Cir. 1986), had granted summary judgment in favor of the town. The Second Circuit,

Kelley argues that, under *Sullivan,* the regulations must be read in light of the context in which they were applied in the particular circumstances of the case. Kelley notes that the *Sullivan* court held that "a theoretical possibility of discretionary action does not automatically classify an application for a license or certificate as a mere 'unilateral hope or expectation.' " Id.

Kelley's reliance on *Sullivan* v. *Salem,* supra, is unavailing. Read in light of its facts and subsequent Second Circuit decisions, *Sullivan* does not support the proposition that a discretionary regulation is insufficient to preclude a clear entitlement to approval of an application if the decision to deny the application is based on an *improper* exercise of that discretion. As we held in *Carr* v. *Bridgewater,* supra, 52–53, the "clear entitlement" test focuses on the degree of discretion that the regulation affords the commission at the time the application is filed. No subsequent conduct by the commission could alter that degree of discretion and give the applicant a protected property interest where none had existed at the time of the filing.

Second Circuit precedent is in accord. In *RRI Realty Corporation* v. *Incorporated Village of Southampton,* supra, and *Dean Tarry Corporation* v. *Friedlander,* 826 F.2d 210, 213 (2d Cir. 1987), the Second Circuit held that a regulation affording discretion to decisionmakers does not give rise to a clear entitlement, even if the decisionmaker in fact exercises that discretion improperly, as long as the reason given for the denial has a basis in the regulation. Distinguishing the circumstances of *Sullivan* from the circumstances of the case before it in *Dean Tarry Corporation,* the court stated

therefore, assumed for the purpose of appellate review that the applicant had met all other regulatory requirements, and remanded the case for a determination of that issue.

that "[i]n *Sullivan,* the unlawful requirement preventing approval of the builder's application [prior acceptance of roads] came out of thin air; it was *not* derived from an existing legislative or administrative standard." *Dean Tarry Corporation* v. *Friedlander, supra.* Moreover, the Second Circuit in *RRI Realty Corporation* held that "even in a case where the denial of the permit *is* arbitrary . . . [t]he fact that the permit could have been denied on non-arbitrary grounds defeats the federal due process claim." (Emphasis in original.) *RRI Realty Corporation* v. *Incorporated Village of Southampton, supra,* 918.

The Second Circuit's subsequent reading of *Sullivan* is consistent with the specific facts of that case. The denial for which Sullivan sought damages was based on a consideration that had no basis in the applicable regulations, but was plucked "out of thin air." *Dean Tarry Corporation* v. *Friedlander, supra.* The applicant could not reasonably have anticipated denial of its application on the stated ground. In this case, however, the articulated reason for the commission's denial of Kelley's application was grounded in the discretionary open space provision of § 6.8B. Accordingly, the commission's erroneous reliance on insufficient dry land within the proposed open space did not erase the degree of discretion otherwise afforded by the regulation at the time the application was filed and Kelley was thus not clearly entitled to approval.

2

The result of our inquiry into the commission's degree of discretion is the same even if we assume, contrary to the preceding analysis, that Judge Walsh's decision invalidated § 6.8B, rather than finding a mere abuse of discretion in the commission's reliance on that provision to deny Kelley's application. At the time the application was filed, the relevant regulation, even if

later invalidated, afforded the commission discretion to deny the application. We conclude, therefore, that Kelley did not have a clear entitlement to approval of his application.

The Second Circuit has decided precisely this issue.[20] In *Dean Tarry Corporation* v. *Friedlander,* supra, a real estate developer sought damages under § 1983 against a town and several town officials who had rejected its site development plan. Subsequent to the rejection, a state court had held that the zoning ordinance under which the town officials had exercised discretion to deny the plan was invalid because it granted more discretion than was permissible under the enabling statute. Id., 211. The Second Circuit held that the subsequent invalidation of the ordinance did not aid the developer in its federal due process claim because the broad discretion conferred by the ordinance "prevented [the developer's] expectation of success from rising to the level of certainty required to give rise to a cognizable property right." Id., 213. Because the broadly worded ordinance[21] was in operation at the time of the town officials' exercise of their discretion, its later invalidation did not affect the applicant's entitlement to approval. See *Carr* v. *Bridgewater,* supra, 52–53.

In this case, similarly, the plain language of § 6.8B, at the time Kelley's application was filed, granted the

---

[20] Although we are not bound by decisions of the Second Circuit, they "are entitled to great weight in the interpretation of a federal statute," such as 42 U.S.C. § 1983. (Internal quotation marks omitted.) *Red Maple Properties* v. *Zoning Commission,* 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992). Deference is particularly appropriate in this case, in which we analyze Kelley's federal constitutional claim pursuant to a mode of analysis that derives from the Second Circuit.

[21] The ordinance in question provided in relevant part: " 'In considering the approval of the Site Development Plan, the Planning Board shall take into consideration the public health, safety and general welfare, [and] the comfort and convenience of the public in general and the residents of the immediate neighborhood in particular . . . .' " *Dean Tarry Corporation* v. *Friedlander,* 826 F.2d 210, 213 n.1 (2d Cir. 1987).

commission discretion to deny subdivision applications because of certain open space concerns. Accordingly, even if Judge Walsh did invalidate that provision in his decision in the administrative appeal, Kelley did not thereby retroactively gain a clear entitlement to approval.

Having failed to establish a protected property interest in subdivision approval, Kelley has not satisfied the threshold requirement of a federal due process claim. We conclude, therefore, that the trial court properly rendered summary judgment in favor of the defendants on Kelley's federal claims, contained in counts one, two and three of the second amended complaint.

## II

We turn now to Kelley's claim that we should recognize[22] a damages remedy that would provide a means of redress for those whose state constitutional rights to due process, guaranteed by article first, § 8, have allegedly been violated by zoning officials. Kelley suggests two alternate bases for recognizing a damages cause of action: (1) Connecticut common law provided for recovery for injuries that were substantially similar to the state due process-based injuries alleged by Kelley and, therefore, article first, § 10,[23] of the Connecticut constitution ensures the continued availability of such recovery; and (2) the reasoning of *Bivens* v. *Six Unknown Named Agents of Federal*

[22] We use the neutral term "recognize" to encompass both Kelley's claim that we should *acknowledge* the existence of a common law damages action for constitutional violations and his quite different claim that we should *create* a damages cause of action by inferring it directly from article first, § 8, of the Connecticut constitution.

[23] Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." The current article first, § 10, originally appeared in article first, § 12, of the constitution of 1818.

*Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), applies with equal force in the state constitutional context as in the federal constitutional context. Kelley claims that the decisions of other states on this issue lend support to his *Bivens* argument. We do not agree that a cause of action for damages either already exists or should exist to redress the injuries alleged by Kelley.

## A

Kelley urges us to recognize a cause of action for damages in this case because a common law damages action existed in Connecticut before 1818, when the state constitution was adopted, for injuries substantially similar to those he allegedly sustained as a result of the defendants' conduct. Kelley contends that article first, § 10, of the state constitution ensures the continued existence of that remedy. We are not persuaded.

We agree with Kelley that we have consistently interpreted article first, § 10, to prohibit the legislature from abolishing a right that existed at common law prior to 1818. "[A]ll rights derived by statute and the common law extant at the time of the adoption of article first, § 10, are incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized injury, thus being exalted beyond the status of common-law or statutory rights of the type created subsequent to the adoption of that provision." *Gentile* v. *Altermatt,* 169 Conn. 267, 286, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); see also *Sanzone* v. *Board of Police Commissioners,* 219 Conn. 179, 194–95, 592 A.2d 912 (1991). Even if a particular right did exist at common law, however, the legislature is entitled to abolish or modify, consistently with article first, § 10, the right as long as it also enacts a reasonable alternative to the enforcement of the right. *Gentile* v. *Altermatt,* supra.

In support of his contention that a common law damages action existed in similar circumstances before 1818 and, therefore, must exist today, Kelley cites *Johnson v. Stanley,* 1 Root (Conn.) 245 (1791), and *Waters v. Waterman,* 2 Root (Conn.) 214 (1795), in both of which the plaintiffs were awarded damages from town selectmen for the selectmen's illegal appointment of overseers to conduct the plaintiffs' affairs. Neither case states whether the basis for the award of damages was a statutory violation or a violation of a fundamental common law principle that we would now characterize as having constitutional significance. Cf. *Grumon v. Raymond,* 1 Conn. 39, 43–44 (1814) (awarding damages from justice of peace for issuing general warrant).[24]

Decisions of this court subsequent to *Johnson* and *Waters* clarify that, in those cases, the selectmen's illegal conduct contravened a *statute* empowering them to appoint overseers in appropriate cases.[25] These later

[24] Compare *Widgeon v. Eastern Shore Hospital Center,* 300 Md. 520, 526–27, 479 A.2d 921 (1984) (common law damages action against state officials existed for violation of rights akin to constitutional rights: " '[t]he personal injury done to . . . [the plaintiff] was very small, so that if the jury had been confined by their oath to consider the mere personal injury only, perhaps 20 [pounds] damages would have been thought damages sufficient; but . . . they saw a magistrate over all the King's subjects, exercising arbitrary power, violating Magna Charta, and attempting to destroy the liberty of the kingdom, by insisting upon the legality of this general warrant before them . . . the 29th chapter of Magna Charta . . . which is pointed against arbitrary power, was violated' ").

[25] The statute in question provided in relevant part: "AN ACT FOR RELIEVING AND ORDERING OF IDIOTS, IMPOTENT, DISTRACTED, AND IDLE PERSONS. . . . [Par.] 8. . . . [T]he Select-men for the Time being, in the several Towns in this State, shall from Time to Time, diligently inspect into the Affairs and Management of all Persons in their Town, whether Housholders or others; and if they shall find any Person or Persons that are reduced, or are likely to be reduced to Want by Idleness, Mismanagement, or bad Husbandry, that then such Select-men may appoint an Overseer to advise, direct, and order such Person in the Management of his Business, for such Time or Times as they shall think proper: A Certificate of which Appointment the Select-men shall forthwith set upon the Sign-Post, and lodge a

precedents do not suggest a constitutional illegality in the misuse of appointive authority. See *Strong* v. *Birchard,* 5 Conn. 357, 361 (1824); *Chalker* v. *Chalker,* 1 Conn. 79, 82–83 (1814); cf. *Colby* v. *Jackson,* 12 N.H. 526, 533–35 (1842) (money damages awarded against selectman for illegally confining a person thought to be incompetent; damages were for "trespass and entry into the plaintiff's house").

In the absence of a clear indication in *Johnson* and *Waters* that the damages awards in those cases redressed rights akin to fundamental constitutional rights, we decline to read these cases as establishing a common law precedent for the existence of a constitutional claim for damages for any and all alleged misconduct by state or local governmental officers. It is more plausible to understand these cases as precursors of the modern principle that violation of statutory rights may allow an injured person to assert a private cause of action or a traditional tort action for damages. See, e.g., *Mead* v. *Burns,* 199 Conn. 651, 663, 509 A.2d 11 (1986) (private cause of action exists under CUTPA for alleged CUIPA violations); *Conaway* v. *Prestia,* 191 Conn. 484, 491, 464 A.2d 847 (1983) (private cause of action exists under CUTPA for alleged violations of certain landlord-tenant statutes). We conclude, therefore, that Kelley has failed to establish that, in the circumstances of this case, a damages action for the violation of a quasi-constitutional right existed at common law in Connecticut prior to 1818 and thereby became incorporated into the state constitution by virtue of article first, § 10.

Copy thereof in the Town-Clerks-Office of said Town; and thereupon no such Person, while under such Appointment, shall be able to make any Bargain or Contract, without the Consent of such Overseer, that shall be binding, or valid in Law." Acts and Laws of the State of Connecticut (1796) pp. 232–34.

## B

As an alternative to his common law argument, Kelley also contends that this court should infer the existence of a cause of action for damages from the existence of the state constitution's due process provision for the reasons of policy articulated in *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,* supra. In that case, the United States Supreme Court created a cause of action for damages for injuries sustained as a result of federal officials' violation of a citizen's rights under the fourth amendment to the federal constitution. Relying on the rationale of *Bivens,* Kelley argues that we should create a state *Bivens* action because damages are the traditional remedy for invasions of personal rights and because the legislature has not prohibited such a cause of action.[26] Moreover, Kelley asserts that the United States Supreme Court has extended *Bivens* to allow a cause of action for damages for violations of the fifth amendment's due process guarantee. See *Davis* v. *Passman,* 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979).

[26] The parties appear to assume that this court has the *power* to infer a cause of action for damages directly from the due process provision of the state constitution. For the purpose of this appeal, we will make the same assumption. Cf., e.g., *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 480, 427 A.2d 385 (1980) (recognizing tort of wrongful discharge); *Urban* v. *Hartford Gas Co.,* 139 Conn. 301, 307, 93 A.2d 292 (1952) (recognizing torts of intentional and negligent infliction of emotional distress); see generally *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 402–406, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) (Harlan, J., concurring) (discussing the federal courts' power to create a damages cause of action for an alleged violation of fourth amendment rights); 4 Restatement (Second), Torts § 874A, and comment (a) (1979) ("[w]hen a legislative provision [including constitutional provisions] protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action").

To place Kelley's *Bivens* claim in perspective, it is useful to review the *Bivens* line of cases. In *Bivens*, the United States Supreme Court created a cause of action for damages to redress injuries allegedly sustained when federal officials illegally searched and seized the plaintiff in violation of his fourth amendment rights. The court reasoned that damages are the "ordinary remedy" for such invasions of personal rights and that it is irrelevant whether the availability of damages is actually *necessary* to enforce the fourth amendment. *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,* supra, 395–97. Rather, "[t]he question is merely whether petitioner . . . is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." Id., 397. Furthermore, the court noted in *Bivens* that there existed neither "special factors counselling hesitation," such as the presence of a question involving the federal government's fiscal policy or a relationship between the government and a soldier, nor an explicit congressional prohibition of a damages remedy in the present circumstances. Id., 396–97.

The United States Supreme Court later extended *Bivens* to create a damages cause of action for injuries sustained when a Congressman discharged an administrative assistant in alleged violation of the fifth amendment due process provision's protection against sex discrimination. *Davis* v. *Passman,* supra. The court in *Davis* cited several factors in support of its decision. First, the court determined that a cause of action for damages was particularly appropriate in the case at hand for two reasons: (1) the plaintiff sought only back pay and, therefore, no complicated issues of valuation and causation would arise; and (2) equitable relief, such as reinstatement, would be unavailing because the defendant Congressman was no longer in office. Id., 245. Second, although the fact that the defendant had

been a member of Congress was a potential "special [factor] counseling hesitation," that factor was overridden by the principle that all persons, including federal officials, were subject to federal law. Id., 246. Third, the court in *Davis* noted the absence of an express congressional prohibition of a damages action for alleged violations of the fifth amendment's due process guarantee. Id., 246–47; see also *Carlson* v. *Green,* 446 U.S. 14, 19–20, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980) (allowing a damages cause of action against individual federal officials for their alleged violations of the petitioner's eighth amendment rights, despite the existence of the Federal Tort Claims Act, under which the petitioner could have sought damages against the federal government).

The United States Supreme Court's decisions in *Bivens, Davis* and *Carlson* reveal that, at least until 1980, the court considered several factors to be significant in determining whether to create a direct cause of action for damages for an alleged federal constitutional violation by federal officials. These factors included: (1) the inadequacy or absence of an alternative remedy; (2) the absence of explicit direction from Congress that no damages remedy should lie; and (3) the absence of any special factors counselling hesitation, such as federal fiscal policy. See J. Steinman, "Backing Off *Bivens* and the Ramifications of This Retreat for the Vindication of First Amendment Rights," 83 Mich. L. Rev. 269, 270–77 (1984).

More recently, however, the United States Supreme Court appears to have retreated from the reasoning underlying *Bivens.* See J. Steinman, supra, 285–97; note, "Two Approaches to Determine Whether an Implied Cause of Action Under the Constitution Is Necessary: The Changing Scope of the *Bivens* Action," 19 Ga. L. Rev. 683, 685 (1985). For example, in *Chappell* v. *Wallace,* 462 U.S. 296, 103 S. Ct. 2362, 76 L.

Ed. 2d 586 (1983), the court refused to allow enlisted military personnel a damages action for alleged violations of their equal protection rights by federal military officers. See also *Bush* v. *Lucas,* 462 U.S. 367, 389–90, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983) (refusing to allow federal employee a damages cause of action against employer for alleged violation of employee's first amendment rights, on the grounds that civil service damages are available and that Congress is better suited to decide to create new remedies). In support of its decision, the court in *Chappell* cited several "special factors [that counsel] hesitation," such as the military's unique discipline based structure, the constitution's delegation to Congress of plenary authority over the military and Congress' establishment of complaint and grievance procedures within the military structure. *Chappell* v. *Wallace,* supra, 302–304. The court emphasized the intramilitary system of justice as an alternate source of remedies that justified its refusal to allow a *Bivens* type action, although the previous *Bivens* cases had also considered the adequacy of any alternative remedy in the analysis of the need for a damages remedy. Compare *Carlson* v. *Green,* supra, 20–23 ("[f]our additional factors, each suggesting that the *Bivens* remedy is more effective than the FTCA [Federal Tort Claims Act] remedy, also support our conclusion that Congress did not intend to limit respondent to an FTCA action"), with *Bush* v. *Lucas,* supra, 372, 389–90 (refusing to create a damages remedy for alleged violation of first amendment rights despite assumption that the available "civil service remedies were not as effective as an individual damages remedy and did not fully compensate [the plaintiff] for the harm he suffered").

In its current configuration, the *Bivens* line of United States Supreme Court cases thus appears to require a would be *Bivens* plaintiff to establish that he or she

would lack any remedy for alleged constitutional injuries if a damages remedy were not created. It is no longer sufficient under federal law to allege that the available statutory or administrative mechanisms do not afford as complete a remedy as a *Bivens* action would provide. This line of federal cases, therefore, does not persuasively support Kelley's argument. We decline Kelley's invitation to rely on *Bivens* itself without regard to its subsequent modification by the United States Supreme Court.

Turning from the federal analogy, Kelley asserts, however, that decisions of other state courts recognizing damages actions for alleged state constitutional violations support his *Bivens* claim. We do not agree.

The several sister jurisdictions that have addressed the issue of whether to recognize a state *Bivens* action have pursued varying methods of analysis, with varying results. In a significant number of cases, however, the focus has been on the presence or absence of an existing alternative remedy, either by way of statute or under the common law, to provide some measure of relief for the injured party. See, e.g., *State* v. *Haley,* 687 P.2d 305, 318 (Alaska 1984) (statutory cause of action exists); *Gay Law Students Assn.* v. *Pacific Telephone & Telegraph Co.,* 24 Cal. 3d 458, 475 n.10, 595 P.2d 592, 156 Cal. Rptr. 14 (1979) (state *Bivens* action appropriate because of the absence of any administrative remedy); *Widgeon* v. *Eastern Shore Hospital Center,* 300 Md. 520, 525–28, 535, 479 A.2d 921 (1984) (no constitutional action in light of common law remedies); *Phillips* v. *Youth Development Program, Inc.,* 390 Mass. 652, 658 n.4, 459 N.E.2d 453 (1983) (need for judicial protection of rights in the absence of statutory remedies); *Rockhouse Mountain Property Owners Assn.* v. *Conway,* 127 N.H. 593, 597–601, 503 A.2d 1385 (1986) (refusal to lay out roads; statutory law provides a remedy in the form of an appeal to the superior court, even

though no right to damages);[27] *Corum* v. *University of North Carolina,* 330 N.C. 761, 783, 413 S.E.2d 276 (1992) (because no other remedy available, common law guarantees plaintiff a direct action under the state constitution); *Provens* v. *Stark County Board of Mental Retardation & Developmental Disabilities,* 64 Ohio St. 3d 252, 261, 594 N.E.2d 959 (1992) (reasonably satisfactory statutory and administrative remedies preclude civil cause of action under state constitution). In other cases, the courts have looked to the particular circumstances of the case, as well as to relevant constitutional history, in deciding whether to recognize a state *Bivens* claim. See, e.g., *Walinski* v. *Morrison & Morrison,* 60 Ill. App. 3d 616, 619–20, 377 N.E.2d 242 (1978) (creating a state *Bivens* action); *Moresi* v. *Department of Wildlife & Fisheries,* 567 So. 2d 1081, 1093 (La. 1990) (creating a state *Bivens* action); *Smith* v. *Department of Public Health,* 428 Mich. 540, 631–32, 410 N.W.2d 749 (1987) (declining to create a state *Bivens* action).

Our examination of these cases leads us to conclude that, as a general matter, we should not construe our state constitution to provide a basis for the recognition of a private damages action for injuries for which the legislature has provided a reasonably adequate statutory remedy. This conclusion accords with the constitutional principle of separation of powers and its requirement for judicial deference to legislative resolution of conflicting considerations of public policy. See, e.g., *State* v. *Campbell,* 224 Conn. 168, 179, 617 A.2d 889 (1992); *Murphy* v. *State Employees Retirement Commission,* 218 Conn. 729, 736, 590 A.2d 974 (1991); *Bartholomew* v. *Schweizer,* 217 Conn. 671, 676, 587 A.2d 1014 (1991). Our legislature has demonstrated its

---

[27] The New Hampshire court's decision also relied on the limited municipal and official immunity of the defendants, who were the town and its selectmen. *Rockhouse Mountain Property Owners Assn.* v. *Conway,* 127 N.H. 593, 599–600, 503 A.2d 1385 (1986).

sensitivity to the importance of protecting constitutional rights. See, e.g., General Statutes § 31-51q.[28]

The circumstances of this case provide no compelling justification for departure from this general principle. We note that the legislature, by enacting General Statutes § 8-8,[29] has provided Kelley an avenue for administrative relief from the wrongful and allegedly unconstitutional conduct of the defendants. It is constitutionally significant that judicial review of the administrative decision may be available. See General Statutes § 8-8 (o). The existence of this remedy weighs heavily against judicial creation of a state *Bivens* action. Moreover, even if such administrative relief were deemed to be inadequate, a proposition to which we do not subscribe, Kelley might have pursued other actions to protect his interests. He might, for example, have brought an action for intentional interference with business expectancy,[30] or for equitable relief, such

[28] General Statutes § 31-51q provides: "LIABILITY OF EMPLOYER FOR DISCIPLINE OR DISCHARGE OF EMPLOYEE ON ACCOUNT OF EMPLOYEE'S EXERCISE OF CERTAIN CONSTITUTIONAL RIGHTS. Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

[29] General Statutes § 8-8 provides in relevant part: "APPEAL FROM BOARD TO COURT. REVIEW BY APPELLATE COURT. . . .

"(b) . . . any person aggrieved by any decision of a board may take an appeal to the superior court for the judicial district in which the municipality is located."

[30] "This court has long recognized a cause of action for tortious interference with contract rights or other business relations. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the

as an action for an injunction against the defendants' allegedly wrongful conduct.

As a matter of policy, the existing remedies, although they may not afford as complete relief as a state *Bivens* action would provide, are particularly appropriate in light of the fact that the Lebanon officials whose conduct allegedly violated Kelley's state constitutional rights are not professionals but are laypersons with little or no technical expertise. See *Gardiner* v. *Conservation Commission*, 222 Conn. 98, 103, 608 A.2d 672 (1992); *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Com-*

defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means." (Citations omitted; internal quotation marks omitted.) *Robert S. Weiss & Associates, Inc.* v. *Wiederlight,* 208 Conn. 525, 535–36, 546 A.2d 216 (1988); see *Solomon* v. *Aberman,* 196 Conn. 359, 364, 493 A.2d 193 (1985); *Blake* v. *Levy,* 191 Conn. 257, 260, 464 A.2d 52 (1983).

Although the cited cases involve actions against private parties, we can discern no reason not to allow the tort of intentional interference with business expectancy to be maintained against public officials as well. Several of our cases in fact suggest that such an action would lie. See, e.g., *Tamm* v. *Burns,* 222 Conn. 280, 285, 610 A.2d 590 (1992) (rejecting the plaintiff's claim that state had taken the plaintiff's property in the constitutional sense, but suggesting that the plaintiff's allegations may "support a claim of nuisance or some other sort of tortious interference by the state"); *Multi-Service Contractors, Inc.* v. *Vernon,* 193 Conn. 446, 450–52, 477 A.2d 653 (1984) (upholding trial court's grant of summary judgment in favor of the defendants, who were members of the permanent municipal building committee of the town of Vernon, on the plaintiff's claim of tortious interference with contract because the plaintiff had failed to allege sufficient facts on the issue of the defendants' bad faith, but implying that claim would have gone forward if sufficient facts had been alleged); see also *Cabinet Realty, Inc.* v. *Planning & Zoning Commission,* 17 Conn. App. 344, 347, 552 A.2d 1218, cert. denied, 210 Conn. 813, 556 A.2d 610 (1989) (jury rendered verdict in favor of the defendants, who were, inter alia, individual members of the Lebanon planning and zoning commission, on the plaintiff's claim of tortious interference with business relations; that verdict not challenged on appeal).

*mission,* 220 Conn. 527, 554, 600 A.2d 757 (1991); *Spero* v. *Zoning Board of Appeals,* 217 Conn. 435, 444, 586 A.2d 590 (1991). To expose the commission members, as well as Lebanon and the commission, to expansive liability in damages for an erroneous interpretation of the parameters of the members' discretion would be likely, for at least two reasons, to have adverse consequences on the parties, local zoning processes and the courts.

First, although potential defendants could avoid liability by not engaging in unconstitutional conduct, they might not be able to predict accurately what conduct would be found to violate the state constitution. The threat of liability would be apt to entail costs of its own, insofar as that threat may have a chilling effect on the zeal with which zoning commissions and their members undertake their responsibilities.[31]

Second, the availability of a state *Bivens* action, with its potential for significant monetary awards, would encourage its pursuit by any disappointed zoning applicant whenever a zoning agency denies the sought after permit or application. The cost to towns, zoning commissions and their members of defending against a myriad of such claims, whether or not meritorious, would be great, and the courts also would incur costs in light of the increased caseload.

Accordingly, we conclude that this case does not require the recognition of a state *Bivens* action because Kelley's existing statutory remedy strikes a proper bal-

---

[31] By contrast, the tort of intentional interference with business expectancy, which may be available to parties like Kelley, requires the plaintiff to establish the bad faith, malice or improper motive of the defendant. See, e.g., *Robert S. Weiss & Associates, Inc.* v. *Wiederlight,* 208 Conn. 525, 535–36, 546 A.2d 216 (1988). One could avoid liability under this tort by not acting maliciously or in bad faith. This subjective standard is one to which laypersons can conform their conduct without knowing the contours of constitutional due process protections.

ance. Section 8-8, supplemented by other potentially available avenues of relief, affords disappointed zoning applicants a reasonable remedy that does not impose unwarranted burdens on the towns, zoning commissions, zoning officials or the courts.

We note, finally, that the very considerations to which Kelley points as justification for judicial creation of a state *Bivens* action point to the advisability of judicial restraint. Kelley suggests that his due process rights were violated because the defendants denied his zoning application, not in the exercise of their administrative discretion, but as a result of improper motivation, political or otherwise. To the extent, however, that the dispute between Kelley and the defendants is a political one stemming from differences in their visions of the future of Lebanon, it is preferable that such a dispute should be resolved not by litigation but within designated political channels: zoning commissions, town boards and other local political institutions. Cf. *Hahn* v. *Zoning Commission,* 162 Conn. 210, 214, 293 A.2d 9 (1972). Accordingly, we conclude that judicial creation of a supplemental damages remedy in this case would be inappropriate.

The judgment is affirmed.

In this opinion CALLAHAN, NORCOTT, KATZ and SANTANIELLO, Js., concurred.

BORDEN, J., dissenting. Although I agree with parts I and II A of the majority opinion, I disagree with part II B. I would infer a *Bivens*-type cause of action; *Bivens* v. *Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971); under our state constitutional due process clause. Accordingly, I dissent from the ultimate determination of the case by the majority.

First, I agree with the parties, and with the assumption of the majority, that we have the power to infer a cause of action for damages directly from the due process clause of our constitution. As the majority indicates, *Bivens* recognizes such a power under the federal constitution; the Restatement (Second) of Torts § 847A (1979) does likewise; and we have inferred private rights of actions for damages for violations of statutory imperatives. See *Mead* v. *Burns,* 199 Conn. 651, 663, 509 A.2d 11 (1986); *Conaway* v. *Prestia,* 191 Conn. 484, 491, 464 A.2d 847 (1983). It would be incongruous to hold that our constitution is a drier source of private rights than the federal constitution or our own statutes.

Second, I would hold that the ownership of property or the right to develop it for legitimate uses is sufficient to establish a constitutionally protected property interest under our own constitution. Both the Ninth and the Third Circuit Courts of Appeal; see *Del Monte Dunes* v. *Monterey,* 920 F.2d 1496, 1508 (9th Cir. 1990); *Bello* v. *Walker,* 840 F.2d 1124, 1127–30 (3d Cir.), cert. denied, 488 U.S. 851, 109 S. Ct. 134, 102 L. Ed. 2d 107 (1988); explicitly use this standard under the federal due process clause, as opposed to the Second Circuit's and our concomitant, more restrictive standard under the federal constitution. See *Carr* v. *Bridgewater,* 224 Conn. 44, 51–52, 616 A.2d 257 (1992).

The more restrictive standard under the federal constitution, employed by the Second Circuit and by Connecticut in the interest of uniformity within this Circuit, is based on considerations that are not present in this case, namely, the notions of federalism and comity, under which the federal courts are reluctant to become federal overseers of the state land use planning process, in 42 U.S.C. § 1983 cases stemming from local land use planning controversies. See *RRI Realty Corporation* v. *Incorporated Village of Southampton,* 870

F.2d 911, 918 (2d Cir.), cert. denied, 493 U.S. 893, 110 S. Ct. 240, 107 L. Ed. 2d 191 (1989). Our state courts, however, already play that role to some extent by reviewing local land use planning decisions, albeit under a limited scope of review in many cases. Furthermore, a standard of the ownership of property or right to develop property for legitimate uses is consistent with our law—both statutory and common—of standing and aggrievement. See, e.g., *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, 225 Conn. 731, 739 n.12, 626 A.2d 705 (1993); *Hall* v. *Planning Commission*, 181 Conn. 442, 445, 435 A.2d 975 (1980).

Against this background, I turn to the cause of action asserted in this case. The complaint explicitly alleges, in some detail, that the plaintiff's "subdivision application conformed in all respects with applicable regulations." It then alleges that "the defendants intentionally, knowingly, and arbitrarily abused their governmental authority as members of a public agency with jurisdiction over land use to obstruct and delay [the plaintiff's] development of the . . . property" in ten specified ways. These ten ways included such conduct as: "misleading Kelley and his attorney about the date of newspaper publication of the Commission's denial, for the purpose of preventing Kelley from exercising his appeal rights"; "intentionally failing to follow clearly-settled legal obligations to" judge his application on the proper basis; intentionally failing to provide him with fundamental fairness at hearings; and intentionally failing to review his application materials before acting on them.

For the purposes of this appeal, these allegations are unchallenged. The defendants did not move to strike the complaint for insufficiency of these allegations. The principal claim involved in this case, and the gravamen of the trial court's summary judgment in favor of the

defendants, is the lack of a *Bivens*-type cause of action under our due process clause, regardless of the nature of the allegations. I proceed, therefore, on the assumption that, for purposes of deciding whether there is such a cause of action, these allegations suffice to spell one out. This means, therefore, that for purposes of this appeal the defendants must be regarded as having used their official positions, not for the purpose of discharging the duties imposed on them by law; not for the purpose of rendering good faith but even grievously mistaken decisions; but for the explicit purpose of harming the plaintiff—in order "to obstruct and delay," "knowingly and intentionally," the project to which they knew he was legally entitled. I do not believe that our due process clause is so anemic, and I do not believe that the need to avoid chilling the zeal of local land use officials is so overwhelming, that even conduct like this cannot be redressed under our state constitution.

I would apply the same factors that informed the original *Bivens* analysis: (1) the inadequacy or absence of an alternative remedy; (2) the absence of explicit direction from the legislature that no damages remedy should lie; and (3) the absence of any special factors counselling hesitation. In this connection, I see no reason, contrary to the position of the majority opinion, why we would be required to follow the post-*Bivens* retreat from its original principles, simply because that has been the course that the United States Supreme Court subsequently followed. This case is our first opportunity to consider the issue, and I do not see why our initial analysis has to begin where the United States Supreme Court's analysis has ended.

Applying these factors, I reach a different conclusion from that of the majority opinion. The gist of the argument of the majority opinion is that "we should not construe our state constitution to provide a basis for the recognition of a private damages action for injuries for

which the legislature has provided a reasonably adequate statutory remedy." I agree with this principle. I disagree, however, with its application to the facts of this case, because a zoning appeal under General Statutes § 8-8 is not a reasonably adequate remedy for the harm of which the plaintiff complains. I would conclude, on the contrary, that a *Bivens*-type action is warranted because there is no adequate alternative remedy.

The harm occasioned by the defendants' intentional and knowing abuse of their official positions was the obstruction and delay of the plaintiff's project, so that by the time his rights to the permit were vindicated on appeal the project was no longer viable. Indeed, the plaintiff claims that, as a result of that delay, the banks that had loaned him money to finance the project began foreclosure proceedings and, in lieu of foreclosure, the plaintiff was forced to deed the property to the banks. The legislative remedy of a zoning appeal is not an adequate alternative to redress by an action for damages for the kind of conduct alleged here, because that remedy does not address the harm intended and caused by that conduct.

One need not be an expert in real estate development to know that one of the best ways to kill such a development is to delay its implementation in the hopes that, by the passage of time, it will no longer be viable when it is finally approved. That hope, it seems to me, is a fair inference provable under the uncontested allegations of the defendants' motives and actions in this case. See *Westport Bank & Trust* v. *Corcoran, Mallin & Aresco,* 221 Conn. 490, 495, 605 A.2d 862 (1992) (we read pleadings to encompass, not only the specific facts alleged, but all facts fairly provable under them). Nor is it an answer to this argument that such a delay would be inherent in a good faith denial of a subdivision application, rather than a bad faith and malicious denial. Constitutionally, it is one thing for a citizen, in order

to vindicate his rights, to be required to undergo the delay inherent in the administrative process resulting from the errors of public officials that are the consequence of evenhanded, if mistaken—even very mistaken—conduct by those officials. That is the price of civilization, to paraphrase Justice Holmes. *Compania De Tabacos* v. *Collector,* 275 U.S. 87, 100, 48 S. Ct. 100, 72 L. Ed. 177 (1927) (Holmes, J., dissenting) ("[t]axes are what we pay for civilized society"). Constitutionally, it is a more odious result to have to undergo those delays solely because those officials—who are supposed to be serving all of the public, including the plaintiff—decide to abuse their power by making the plaintiff the target of their animus.

I am not persuaded, moreover, at least not without a lot more research and authority than the opinion provides, that an action for tortious interference with a business expectancy supplies such an adequate remedy. It is far from clear to me that the plaintiff would have had such a claim against these public officials. The case cited by the majority, *Blake* v. *Levy,* 191 Conn. 257, 260, 464 A.2d 52 (1983), is not an action against a public official.[1] Furthermore, the suggestion that the plaintiff could have brought an action for injunctive relief as an adequate remedy is unpersuasive. By the time he had won his zoning appeal, the harm was done. What was there left to enjoin? And until he had won his zoning appeal, it was far from certain that he had been entitled to the permit all along.

The second *Bivens* factor is the question of whether there has been explicit legislative direction that no such action should lie. It seems clear to me that there has been no such explicit direction.

---

[1] If, on the other hand, such an action does lie, that undermines the majority's policy argument that recognition of this cause of action will chill the officials' zeal to perform their duties. In any event, it seems to me that the question is uncertain enough so as not to be determinative of the issue in this case.

The third factor is the absence of special factors counselling hesitation. I acknowledge that imposing financial responsibility on the town for the intentionally abusive conduct of its public land use planning officials may be such a factor. Nevertheless, I have several responses. I do not believe that this is a "special" factor counselling prohibition; if financial expense alone were such a factor, then by definition there could never be a *Bivens*-type action for damages because a successful action for damages means financial expense for the defendants. Furthermore, "hesitation" does not mean absolute prohibition. It implies that we weigh all the factors carefully. Finally, towns are now liable for the wilful and malicious torts of their employees; see General Statutes § 7-101a; and for *federal* civil rights violations by their land use officials, albeit after a more difficult threshold is passed; see *Carr* v. *Bridgewater,* supra; and I do not believe that the incremental liability resulting from the recognition of a *Bivens*-type action is great enough to require an absolute prohibition.

I disagree, also, with the policy argument made by the majority. The argument is twofold: (1) exposure to liability on the part of local, lay zoning commission members would chill the zeal with which they perform their duties; and (2) the availability of a *Bivens*-type action would encourage disappointed applicants to sue whenever an application is denied, with deleterious financial effects on the towns, commission members and the courts.

I do not underestimate the potential chilling effect, but I think that the argument is overstated. The same officials are already subject to suit under 42 U.S.C. § 1983, although, as I acknowledge previously, a higher threshold must be mounted for the plaintiff to succeed. Furthermore, other local officials are clearly subject to similar federal civil right actions, both in federal

court and in our state courts. In those cases; see, e.g., *DeLaurentis* v. *New Haven,* 220 Conn. 225, 237, 597 A.2d 807 (1991); there is no high initial threshold as in *Carr* v. *Bridgewater,* supra, and yet there is no evidence that such other officials perform their duties with less zeal than is appropriate, simply because they are subject to suit.

Furthermore, I believe that the chilling effect would be "warmed" by a requirement that either: (1) the plaintiff allege and prove malice; or (2) the defendants be entitled to a defense of qualified immunity. See, e.g., *DeLaurentis* v. *New Haven,* supra, 243 (" '[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties' "). Moreover, what the majority opinion regards as having a chilling effect is not an unmitigated disaster. It also has the beneficial effect of discouraging out-of-control local officials, as the defendants are alleged to have been here, from abusing their power at the expense of one of their citizenry.

I also think that the "litigation floodgates" argument is overstated. No doubt, there would be more suits than there are now under federal § 1983. But these are, I suspect, expensive cases to litigate and difficult cases to win, particularly with qualified immunity available as a defense. Those difficulties will act as something of a dike against the feared flood of litigation. More significantly, what I propose here is essentially already available in the states following the decisons of the Ninth and Third Circuit Courts of Appeal, and I am not aware of any flood of litigation in the state courts in those parts of the country.[2]

I also disagree with the suggestion of the majority that a dispute like this should be resolved through

---

[2] I would be willing, however, to be persuaded otherwise if there were such evidence available.

political channels. Resort to the ballot box is little consolation to a property owner who has already been victimized, to his financial harm, by the abusive conduct of the very officials who are supposed to be representing him, along with everyone else in town.

I recognize that we have no right to expect, in our democratic society, that our local public officials will never make mistakes—even terrible ones—in the performance of their duties. We do have the right, however, to expect that they will not use their positions of authority—even if unpaid and difficult, as are the positions of the defendants in this case—to work *against* us for malicious motives. I believe that our constitutional due process clause is robust enough to offer a remedy for such conduct, and that our honest local citizens are staunch enough that they will continue to perform their duties in good faith even though someone might later claim, baselessly, that they acted as alleged in this case. I would hold that, if a property owner has been victimized as alleged in this case, our state constitutional due process clause does provide a direct remedy by way of an action for damages.

I would also caution, however, that the source of this decision is the conclusion that the legislature has not supplied an adequate alternative remedy. The fact that we infer a remedy from the due process clause, based upon that inadequacy, necessarily also implies that the legislature can still enter the field and supply such a legislative remedy that would supplant this judicially inferred remedy.

Had the legislature, for example, already enacted a specific statutory remedy aimed at this kind of public conduct—or enacted a more general statute that, as properly applied, supplied a reasonably adequate alternate remedy to a direct action under our due process clause—I would agree with the conclusion reached by

the majority. The fact that we have, because of this lawsuit, entered the fray before the legislature cannot mean that the legislature is somehow now foreclosed. First in time does not necessarily mean first in right, at least when it comes to the interplay between our legislative and judicial branches, each implementing the due process clause of our state constitution. I suggest, therefore, that the legislature would still be free to do so, and to do so in ways that balance the competing interests—individual and town—more creatively than we can by adjudication, in which there must be a winner and a loser, and in which ordinarily winner takes all.

BERDON, J., concurring in part and dissenting in part. I agree with the majority that the plaintiff has failed to establish a protected property interest in the approval of his subdivision application and therefore has not met the threshold requirement of a federal due process claim under the Second Circuit Court of Appeals' "clear entitlement" test, adopted by this court in *Red Maple Properties* v. *Zoning Commission,* 222 Conn. 730, 738, 610 A.2d 1238 (1992).

Nevertheless, the plaintiff clearly alleged the violation of his due process rights under the state constitution. We recognize that "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed

by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." (Internal quotation marks omitted.) *State* v. *Marsala,* 216 Conn. 150, 160, 579 A.2d 58 (1990).

Accordingly, although we defer to the Second Circuit by using the "clear entitlement test" in cases involving the application of federal law;[1] *Red Maple Properties* v. *Zoning Commission,* supra; we may afford greater rights under the state constitution by holding that the plaintiff's property interest is in the property owned, rather than in the entitlement to the permit. I therefore agree with Justice Borden that "the ownership of property or the right to develop it for legitimate uses is sufficient to establish a constitutionally protected property interest under our own constitution." This court, like the Third and Ninth Circuit Courts of Appeal, should focus on whether the governmental action was "arbitrary and irrational." *Del Monte Dunes* v. *Monterey,* 920 F.2d 1496, 1508 (9th Cir. 1990); *Bello* v. *Walker,* 840 F.2d 1124, 1129 (3d Cir.), cert. denied, 488 U.S. 851, 109 S. Ct. 134, 102 L. Ed. 2d 107 (1988).

It is clear to me that when the government violates an individual's state constitutional right, that individual should be made whole. Otherwise, the right would be an empty and meaningless one. "To say that govern-

---

[1] In *Red Maple Properties* v. *Zoning Commission,* 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992), we gave deference to the "entitlement theory" only because we are within the Second Circuit. "In deciding to adopt the analysis of the Second Circuit Court of Appeals, we recognize that '[t]he decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of a federal statute. This is particularly true in 42 U.S.C. § 1983 cases, where the federal statute confers concurrent jurisdiction on the federal and state courts. It would be a bizarre result if this court [adopted the 'arbitrary and capricious' analysis] when in another courthouse, a few blocks away, the federal court, being bound by the Second Circuit rule, required [the '*Roth* entitlement test'] [*Board of Regents* v. *Roth,* 408 U.S. 564, 576–78, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)]." Id.

ment should pay its way and bear the costs of its transgressions is like saying that people should tell the truth, earn their keep, and pay their debts. We can imagine exceptions to each of these maxims, circumstances under which we might be prepared to suspend their force, but they remain foundation stones of our moral order. [P. Schuck, Suing Government (1983) p. 112]." J. Friesen, "Recovering Damages for State Bills of Rights Claims," 63 Tex. L. Rev. 1269 (1985). The reasoning employed in *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), which holds that a cause of action for damages is available for violation of the Fourth Amendment, is also applicable to violations of state constitutional rights. " '[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.' *Bell* v. *Hood,* 327 U.S. [678, 684, 66 S. Ct. 773, 90 L. Ed. 939 (1946)]." Id., 392.

It should not be surprising that damages are available to a person whose state constitutional rights have been violated. Long before the adoption of our constitution of 1818, violations of fundamental rights were redressed by civil action for damages. The parties involved in obtaining, issuing and executing an illegal warrant, for instance, were liable in an action for damages based upon trespass. "If a warrant be granted, which is against law, such as no magistrate or justice of the peace should issue, the magistrate granting it, the officer executing it, and the party obtaining it, are liable in an action of trespass." 1 Z. Swift, Digest of the Laws of the State of Connecticut (1822) p. 495; see also *Grumon* v. *Raymond,* 1 Conn. 39, 44 (1814). Likewise, selectmen who wrongfully and illegally appointed an overseer over the plaintiff without just or legal cause were liable for damages. *Johnson* v. *Stanley,* 1 Root

(Conn.) 245 (1791); see also *Waters* v. *Waterman,* 2 Root (Conn.) 214 (1795). It is clear that the framers of our constitution envisioned that persons whose rights were violated would be entitled to redress for damages.

I agree with the majority, however, that a private action for damages is not available for state constitutional violations when "the legislature has provided a reasonably adequate statutory remedy." In many cases, the right to appeal provided in General Statutes § 8-8 is adequate to protect the property owner from arbitrary and capricious action on the part of government in a land use case. If the legislature has not provided a remedy or if the remedy is not reasonably adequate, however, in view of the facts of a particular case, a private cause of action is constitutionally available to right the wrong.

In this case, given the egregious allegations outlined by Justice Borden in his dissent, the right to appeal pursuant to § 8-8 did not provide an adequate remedy. The appeal resulted merely in the reversal of the Lebanon planning and zoning commission; it did nothing to remedy the harm caused by the defendant's intentional and arbitrary abuse of government authority "to obstruct and delay [the plaintiff's] development of the . . . property."

The majority expresses concern about protecting citizens who serve as members of local zoning boards and commissions. I recently expressed this same concern in *Carr* v. *Bridgewater,* 224 Conn. 44, 61, 616 A.2d 257 (1992) (*Berdon, J.,* concurring), as follows: "We depend heavily upon citizen participation in state and town boards and commissions. This is particularly true in the regulation of land use, which is of the utmost importance not only for a town's orderly development, but also for the protection of our environment. Our legislature has delegated this regulation to the towns.

E.g., General Statutes §§ 8-1 and 8-2. The amicus curiae brief of the Conservation Law Foundation of New England, Inc., appropriately notes the following: 'This important regulatory function is performed by members of local commissions, elected or appointed, who serve without compensation. They receive little or no formal training, legal or otherwise; and unlike many who appear before them, they are not supported by any full-time professional staff. They have to make innumerable on-the-spot decisions, procedural and substantive, that may have significant legal effects; but in many cases their only source of legal advice is a part-time town attorney, otherwise engaged in private practice, who generally is available for consultation only before or after the fact.' " In *Carr*, however, I recognized the need for balance, especially in cases involving allegations as serious as those lodged in the present case. "At the same time, I am concerned with the rights of property owners, such as the plaintiff, and their right to develop their property in a manner permitted by the regulations." Id.

In view of this need for balance, I believe that public policy requires us to insulate public servants with a qualified immunity, the contours of which are set out in *Harlow* v. *Fitzgerald,* 457 U.S. 800, 813–14, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id., 818. Whether there is qualified immunity is generally a question for the court rather than a jury. *Hughes* v. *Meyer,* 880 F.2d 967, 969 (7th Cir. 1989), cert. denied sub nom. *Hughes* v. *Buss,* 495 U.S. 931, 110 S. Ct. 2172, 109 L. Ed. 2d 501 (1990).

"Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly

established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors." *Harlow* v. *Fitzgerald,* supra, 818–19.

In *Harlow,* however, the court went on to state: "By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " Id., 819.

I would reverse the summary judgment and remand the case to the trial court for further proceedings. Accordingly, I concur in part I of the majority opinion and dissent to part II, and I concur in part with Justice Borden's dissent.