1998 ME 198

**Jon ANDREWS**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al.**

Supreme Judicial Court of Maine.

Argued May 5, 1998.

Decided Aug. 3, 1998.

David G. Webbert (orally), Johnson & Webbert, L.L.P., Augusta, for plaintiff.

Andrew Ketterer, Attorney General, Dennis J. Harnish, Asst. Atty. Gen. (orally), Augusta, for defendants.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA, and SAUFLEY, JJ.

RUDMAN, Justice.

[¶ 1] The Department of Environmental Protection and several of its employees in their personal capacities[1] appeal from the denial in part by the Superior Court (Kennebec County, *Alexander J.*) of their motion for a summary judgment. The defendants con-

tend that the court erred in determining that disputed issues of fact precluded the grant of a summary judgment. Andrews asserts that the defendants' interlocutory appeal must be dismissed because it violates our final judgment rule. We deny the motion to dismiss and remand for the entry of a summary judgment in part.

[¶ 2] Jon Andrews initiated this action against the DEP and against several of its employees in their personal capacities, alleging, *inter alia,* that they had violated his federal and state free speech rights by pursuing a course of adverse employment actions against him in retaliation for a letter he wrote to the *Maine Times.* Andrews sought declaratory, injunctive, and monetary relief pursuant to 42 U.S.C. § 1983 (1994 & Supp. 1998) and pursuant to article I, section 4 of the Maine Constitution. The defendants moved for a summary judgment, arguing, *inter alia,* that they are entitled to qualified and sovereign immunity from his suit, and that a violation of the free speech clause of the Maine Constitution cannot support a private cause of action. Andrews opposed the motion, contesting sixty-four of the 117 assertions in the defendants' Statement of Undisputed Facts. The court denied the motion as to Andrews's constitutional claims[2] on the basis that factual issues exist as to whether the defendants' employment actions towards Andrews were taken to retaliate for his speech. The defendants appeal.

I.

[¶ 3] Andrews urges us to dismiss this appeal, arguing that it is impermissibly interlocutory pursuant to the decision of the United States Supreme Court in *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). In *Johnson,* the Supreme Court limited federal courts' interlocutory review of summary judgment denials in qualified immunity cases. *See id.* at 313, 115 S.Ct. 2151. Previously, the Court had held that an interlocutory decision denying a

---

1. The individual defendants, Dennis Phillips, Alan Prysunka, David Sait, and George Viles, all were employed by the DEP as of the initiation of this suit.

2. Andrews complaint also included a claim pursuant to the Whistleblowers' Protection Act, 26 M.R.S.A. §§ 831–840 (1988). The court granted the defendants a summary judgment as to this claim. Andrews has not appealed from that portion of the court's judgment.

claim of qualified immunity may be immediately appealed. *See Mitchell v. Forsyth,* 472 U.S. 511, 525–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In *Johnson,* however, the Court prohibited an immediate review of the denial of a summary judgment resulting from a conclusion that the record raises genuine issues of material facts concerning the defendants' conduct. *See* 515 U.S. at 313, 115 S.Ct. 2151. The defendants acknowledge the holding of *Johnson* but assert that we nevertheless may afford immediate review because they are willing to stipulate to Andrews's version of factual events for purposes of this appeal.

[¶ 4] Although our final judgment rule generally bars immediate review of the denial of a summary judgment, we have determined that "the denial of a motion for a summary judgment based on a claim of immunity is immediately reviewable pursuant to" the death knell exception to the final judgment rule. *J.R.M., Inc. v. City of Portland,* 669 A.2d 159, 160 & n. 1 (Me.1995). The death knell exception "permits an appeal from an interlocutory order where substantial rights of a party will be irreparably lost if review is delayed until final judgment." *Cook v. Cook,* 574 A.2d 1353, 1354 (Me.1990) (citations and quotations omitted). The death knell exception applies to the denial of a summary judgment based on qualified immunity because qualified immunity confers more than immunity from damages; it is intended to provide immunity from suit, since " 'even such pretrial matters as discovery … can be peculiarly disruptive of efficient government.' " *J.R.M.,* 669 A.2d at 160 (quoting *Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. 2806).

[¶ 5] In this case, the Superior Court did not reach the issue of qualified immunity because it determined that the parties' factual disputes precluded a summary judgment. We must decide whether the defendants' willingness to stipulate to Andrews's version of factual events for purposes of this appeal permits us to review the denial of a summary judgment in this case pursuant to the death knell exception. The Supreme Court explained its *Johnson* holding in its decision in *Behrens v. Pelletier:*

*Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly 'separable' from the plaintiff's claim, and hence there is no 'final decision' … summary-judgment determinations are appealable when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity—typically, the issue whether the federal right allegedly infringed was 'clearly established.'

516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (citations omitted). The First Circuit has interpreted *Johnson* and *Behrens* to permit a defendant who has been denied a summary judgment due to the existence of an issue of fact to "concede[ ] arguendo the facts found to be disputed … [and] tak[e] an interlocutory appeal on a legal claim that the defendant is nevertheless entitled to qualified immunity on facts not controverted." *Berthiaume v. Caron,* 142 F.3d 12, 15 (1st Cir. 1998); *accord Vance v. Nunnery,* 137 F.3d 270, 273 & n. 2 (5th Cir.1998); *Jemmott v. Coughlin,* 85 F.3d 61, 66 (2d Cir.1996). Although we are not bound by *Johnson, Behrens,* and their progeny, *see Johnson v. Fankell,* 520 U.S. 911, 117 S.Ct. 1800, 1803–04, 138 L.Ed.2d 108 (1997) (rejecting contention that states "must follow the federal construction of a 'final decision' "), we find their analyses persuasive. Because the defendants would lose their immunity from suit if we were to grant Andrews's motion to dismiss this appeal, we will examine whether, if Andrews were to persuade a trier of fact to accept his version of factual events, the defendants would be entitled to immunity from his claims.

II.

[¶ 6] The DEP employs Jon Andrews as an Oil and Hazardous Materials Specialist in its Division of Response Services. Andrews's responsibilities include "field work responding to and directing the clean-up of

oil and hazardous materials in order to protect the environment and public health." In August of 1992, Andrews met with Mike and Amy Knowlton, alleged environmental offenders, and State Representative Paul Jacques. Representative Jacques was then the co-Chair of the Legislature's Joint Energy and Natural Resources Committee, the committee with oversight over the DEP. Representative Jacques complained about Andrews's conduct during this meeting with the Knowltons to Andrews's DEP supervisors. The DEP disciplined Andrews in the form of an oral reprimand.[3]

[¶ 7] In the June 25, 1993 edition of the *Maine Times,* an article entitled *"When the system fails: How do you protect small business from the bureaucracy?"* appeared. Andrews's August 1992 meeting with the Knowltons was a subject of this article. The article began: "[a]fter Mike and Amy Knowlton had a run-in with a Department of Environmental Protection official, the Legislature pushed through new laws to solve what the department claims was a personnel problem. Legislators saw the issue as calling a halt to bureaucratic arrogance." A related article, *"Making costly change: Mike and Amy Knowlton were seen as victims of a regulatory system run amok,"* stated in part:

> when Mike and Amy Knowlton, who own a gas station and convenience store in the tiny town of Freedom, ran into trouble with the Department of Environmental Protection (DEP), they went to an important legislator, who in turn ran into a particular regulator's rude behavior.
>
> . . . .
>
> 'I told them to look at the data,' says Alan Prysunka, who is responsible for the oil and hazardous materials cleanup program at the DEP. 'My field staff deal with 300 to 400 cases a year. I have one staff person who acted improperly. But are you going to change an entire program because of a personnel problem?'
>
> 'Yes,' responds Rep. Paul Jacques (D–Waterville), an eight-term lawmaker and House chairman of the energy committee. Jacques says it isn't just because he is a

friend of the Knowltons. The reason is because Prysunka's errant staffer is really part of a pervasive 'attitude' problem at DEP that lawmakers feel helpless to change.

[¶ 8] In response to these articles, Andrews wrote a letter to the *Maine Times* that was published in the July 9, 1993 edition. His letter stated in part:

> Randy Wilson's article, *'When the System Fails'* (MT, 6/25/93), regarding a gasoline station/oil terminal owner and his experiences with the Department of Environmental Protection (DEP), made light of several issues that are important to a thorough understanding of that situation.
>
> I hope that most readers were able to determine from the article that Mr. Knowlton, an experienced oil industry professional, is a repeat environmental offender. His violations are very directly related to the petroleum contamination that currently underlies a position of the village of Freedom.... Knowlton's dissatisfaction with the DEP stems from a determination by DEP staff, acting in accordance with State law, that Knowlton, Inc., had failed to meet certain minimum operation standards that were specifically designed to prevent the sort of contamination that resulted at this property. Therefore, Knowlton, Inc., should bear the financial responsibility for clean-up, Mr. Knowlton (and the Maine Oil Dealer's Association, and Representative Jacques) would prefer that remediation be conducted at public expense.
>
> Perhaps some future *Maine Times* article will examine the effectiveness of State environmental policy at preventing the sort of pollution caused by Knowlton, Inc., or will investigate whether the current trend toward increasing use of public monies for clean-up of *preventable* industrial errors is really in the best interest of the Maine public.

This letter and the *Maine Times* articles to which it responded were posted on a DEP workplace bulletin board.

---

**3.** An arbitrator determined that the DEP violated the parties' collective bargaining agreement by issuing this oral reprimand to Andrews, and he ordered the penalty's rescission.

[¶ 9] Andrews maintains that the DEP has taken adverse employment actions against him to retaliate for this letter, including the denial of numerous requests to attend training programs and "a campaign of harassment and retaliation" by his supervisors in the form of "negative annual performance evaluations and unwarranted formal reprimands." For purposes of this appeal, the defendants have stipulated that the alleged adverse employment actions were taken to retaliate for Andrews's letter.

### III.

[¶ 10] A party is entitled to a summary judgment if the material facts are undisputed and if on the basis of the undisputed facts the party is entitled to a judgment as a matter of law. *See Johnson v. Samson Constr. Corp.*, 1997 ME 220, ¶ 5, 704 A.2d 866, 868. We review the denial of a summary judgment for an error of law. *See id.* Section 1983 of Title 42 of the United States Code provides:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (1994 & Supp.1998). The DEP, a state agency, is not a "person" pursuant to section 1983. *See Campaign for Sensible Transp. v. Maine Turnpike Auth.*, 658 A.2d 213, 216 (Me.1995). The court erred in not granting the DEP a summary judgment as to Andrews's section 1983 claims.

[¶ 11] State officials sued in their personal capacities are "persons" pursuant to section 1983. *See Hafer v. Melo*, 502 U.S. 21, 23, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).[4] A state official sued for monetary damages pur-

suant to section 1983 may raise the defense of qualified immunity. *See, e.g., Lyons v. City of Lewiston*, 666 A.2d 95, 99 (Me.1995). Qualified immunity shields " 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A public official claiming qualified immunity thus must establish either that he or she did not violate the plaintiff's rights or that "given the state of the law a reasonable official would not have understood that he [or she] was doing so." *Id.*

[¶ 12] "In order to determine that a right is clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent in light of preexisting law." *Parsons v. Wright*, 649 A.2d 1108, 1111 (Me.1994) (citations and quotations omitted). We have cautioned that an action's unlawfulness can be apparent even though that action has not previously been held to be unlawful. *See Struck v. Hackett*, 668 A.2d 411, 416 (Me.1995). We focus on the objective reasonableness of the official's conduct, not on whether the plaintiff actually suffered a violation of his or her rights. *See Lyons*, 666 A.2d at 99.

[¶ 13] Whether a public official is entitled to qualified immunity is a question of law. *See Struck*, 668 A.2d at 416. Our analysis begins with an "identification of the right at issue and proceeds to place that right in historical perspective. What the law was and whether it was clearly established at the time of the alleged violation are questions of law." *Lyons*, 666 A.2d at 99–100. Andrews asserts that the defendants violated his free speech rights by subjecting him to adverse employment actions in retaliation for his letter to the *Maine Times*. The law has been clearly established since the Supreme

---

4. In contrast, state officials sued in their official capacities are "persons" pursuant to section 1983 only if sued for injunctive relief, not for monetary damages. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Court's decision in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that "[a] government employee retains the First Amendment right to speak out, as a citizen, on matters of public concern, so long as the employee's speech does not unduly impede the government's interest, as employer, in the efficient performance of the public service it delivers through its employees." *O'Connor v. Steeves*, 994 F.2d 905, 912 (1st Cir.1993). Our inquiry is whether reasonable public officials could have disagreed as to whether Andrews's letter to the *Maine Times* was entitled to the protection afforded by *Pickering*.

[¶ 14] To determine whether a public employee's First Amendment claim is actionable, we first must determine "whether the employee was speaking 'as a citizen upon matters of public concern,' or, alternatively, 'as an employee upon matters only of personal interest.'" *O'Connor*, 994 F.2d at 912 (quoting *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The defendants do not dispute that Andrews's speech addressed a matter of public concern. Andrews's letter questioned the propriety of expending public funds to clean up the environmental damage caused by preventable industrial accidents. The expenditure of public funds is a matter of public concern. *See, e.g., Gardetto v. Mason*, 100 F.3d 803, 814 (10th Cir.1996) ("The speech of persons able to offer a well-informed perspective on expenditures of public funds may be especially valuable to public debate on such subjects.").

[¶ 15] We next must "balance the strength of the employee's First Amendment interest, and any parallel public interest in the information which the employee sought to impart, against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through its employees." *O'Connor*, 994 F.2d at 912. Several federal circuit courts have observed that a public employee's free speech right, as guaranteed by the *Pickering* decision and its progeny, will rarely be "clearly established" for purposes of a qualified immunity analysis, because the de-

gree of First Amendment protection afforded by *Pickering* depends upon this fact-based balancing test. *See, e.g., O'Connor*, 994 F.2d at 917 n. 11; *Bartlett v. Fisher*, 972 F.2d 911, 916–17 (8th Cir.1992); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1323 (11th Cir.1989); *Noyola v. Texas Dep't of Human Resources*, 846 F.2d 1021, 1025 (5th Cir. 1988). Although we caution that a right may be clearly established even if the degree of protection that it receives varies according to a fact-based balancing, we nevertheless recognize that the relative weights of the interests to be balanced rarely will be sufficiently disparate to preclude reasonable officials from disagreeing as to whether the employee's First Amendment rights were violated.

[¶ 16] We agree with the defendants' contention that reasonable public officials could disagree as to whether the DEP's interest in maintaining its efficient operations outweighs Andrews's First Amendment interest in his *Maine Times* letter. The defendants have alleged two disruptions in their efficiency: Andrews's letter threatens to damage the DEP's reputation because it suggests that the DEP blamed Andrews to cover up DEP mismanagement and legislative mistakes; and his letter threatens to interfere with the DEP's "regular operations by angering the Legislature and inducing the Legislature, led by Representative Jacques, to enact further amendments to the Oil Act which would further limit DEP's ability to administer the Insurance Fund." The defendants presented the deposition testimony of Eugene Guilford, president of the Maine Oil Dealers Association, in which he described the MODA's practice of advocating for legislation that reduces the DEP's breadth of regulatory authority. Guilford indicated that "'if there was an instance that had in some way angered a citizen in what they believed was unfair treatment at the hands of the department, generally speaking, those were used to sustain arguments that their regulatory authority should be restrained.'" Guilford specifically referenced the Knowltons' 1992 meeting with Andrews, testifying that he had used the Knowltons' and Representative Jacques's dissatisfaction with that meeting as an "'opportunity.'"

[¶ 17] The defendants also presented the deposition testimony of Alan Prysunka, one of Andrews's DEP supervisors, in which he states that the *Maine Times* articles in the June 25, 1993 edition, concerned him " 'that the portrayal of the overall program being mismanaged or that it was established in a way that was unfair ... would possibly lead to—to legislators reading it and others saying, Well God. Look at this. We've got to change the law again.' " Prysunka explained that Andrews's letter in response to these articles concerned him not because of its substance but because it was

> just more fuel to the fire ... what I didn't want to have happen, really, was then there may be a response from MODA or somebody else writing this continuation of letters and letters and just keeping it alive. I really was hoping the first article would come out and die and that would be the end of it. That was my biggest concern with Jon and his letter.

■■■ [¶ 18] We acknowledge that the defendants have failed to produce any evidence that Andrews's speech impeded harmony among his DEP coworkers or interfered with his supervisors' ability to maintain discipline. *See, e.g., McDonough v. Trustees of the Univ. Sys. of New Hampshire*, 704 F.2d 780, 784 (1st Cir. 1983) (articulating general guidelines for evaluating an alleged disruption of workplace efficiency). Courts are divided as to whether an employee's speech may serve as justification for discipline when the threatened disruption resulting from that speech primarily involves the employer's external relationships. *Compare Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir.1989) (stating that police department "cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future") *with Bartlett*, 972 F.2d at 917 (finding that state's efficiency interest outweighed state trooper's First Amendment interest because evidence demonstrated that trooper's speech caused damage to Highway Patrol's reputation and hostility on the part of the public).

We determine that reasonable public officials could disagree as to whether the defendants' conduct violated Andrews's First Amendment right. We therefore conclude that the DEP's employees are entitled to qualified immunity from Andrews's section 1983 claim for damages.

### IV.

■■■ [¶ 19] The individual defendants, however, may *not* invoke qualified immunity as a defense to Andrews's section 1983 claims for declaratory and injunctive relief. *See, e.g., Lugo v. Alvarado*, 819 F.2d 5, 7 (1st Cir.1987) (stating that "a defense of qualified immunity is totally immaterial" to a claim for injunctive relief). The court therefore did not err in denying the individual defendants' summary judgment motion as to those claims.

[¶ 20] We wish to make clear that Andrews may proceed against the individual defendants in their personal capacities for declaratory and injunctive relief. The distinction between official capacity and personal capacity lawsuits is frequently misunderstood. The Supreme Court has described this distinction as follows:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes *under color of state law.* Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.
>
> ... while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Kentucky v. Graham*, 473 U.S. 159, 165–166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quotations and citations omitted) (emphasis added). "[T]he phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, *not the capacity in which the officer inflicts the alleged injury.*" *Hafer*, 502 U.S. at 26, 112 S.Ct. 358 (emphasis added). In

this case, therefore, Andrews may seek equitable relief against the defendants in their personal capacities on the basis of injuries they inflicted upon him while performing as State employees.

## V.

■ [¶ 21] The Superior Court erred in denying the defendants a summary judgment as to Andrews's state constitutional claims. Andrews seeks monetary, declaratory, and injunctive relief pursuant to article I, section 4 of the Maine Constitution, which provides in relevant part: "[e]very citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty; ...." Me. Const. art. I, § 4. We agree with the defendants' contention that this provision of the Maine Constitution cannot support a private cause of action.

[¶ 22] In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court held that a litigant could sue federal agents for damages resulting from their violations of his Fourth Amendment rights, notwithstanding the absence of a federal statute to provide such a remedy. *See id.* at 389, 91 S.Ct. 1999. The Court noted both the lack of "special factors counselling hesitation in the absence of affirmative action by Congress" and the lack of an "explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents." *Id.* at 396–97, 91 S.Ct. 1999. Other jurisdictions have analyzed whether litigants may imply private causes of action pursuant to their state constitutions by applying a *Bivens* analysis. *See, e.g., Board of County Comm'rs v. Sundheim*, 926 P.2d 545 (Colo.1996) (en banc); *Kelley Property Dev. v. Town of Lebanon*, 226 Conn. 314, 627 A.2d 909 (1993); *Dick Fischer Dev. No. 2, Inc. v. Department of Admin.*, 838 P.2d 263 (Alaska 1992).

■ [¶ 23] In this case, specific legislative action creating a private cause of action for a violation of a person's rights under the Maine Constitution, *see* Maine Civil Rights Act, 5 M.R.S.A. §§ 4681–4685 (Supp.1997),

precludes the remedy sought by Andrews. Pursuant to the Act:

[w]henever any person, whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat [thereof] ... with the exercise or enjoyment by any other person of rights secured by ... the Constitution of Maine ..., the person whose exercise or enjoyment of these rights has been interfered with, or attempted to be interfered with, may institute and prosecute in that person's own name and on that person's own behalf a civil action for legal or equitable relief.

5 M.R.S.A. § 4682. Andrews has not alleged an interference with his free speech rights by physical force or violence, damage or destruction of property, trespass on property, or threats thereof. *See* 5 M.R.S.A. § 4682. He therefore has no cause of action pursuant to the Act. We decline to expand the available remedies for a violation of rights guaranteed by the Maine Constitution beyond those which the Legislature in its wisdom has provided.

The entry is:

Motion to dismiss denied. Remanded for entry of a judgment in favor of the defendants on all claims except as to claims against the individual defendants for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

DANA, J., with whom ROBERTS, J., joins, concurs in part, dissents in part and files an opinion.

DANA, Justice, with whom ROBERTS, Justice, joins, concurring in part and dissenting in part.

[¶ 24] I agree that Andrews's motion to dismiss this appeal should be denied, that the individual defendants may not invoke qualified immunity as a defense to an action for equitable relief, and that the DEP, a state agency, is not a proper defendant in a section 1983 action. I also concur in the Court's judgment that the defendants are entitled to

a summary judgment on Andrews's claims brought pursuant to the Maine Constitution, although I am not convinced that the Maine Civil Rights Act necessarily precludes a private cause of action for a constitutional violation in the absence of physical force or violence, damage or destruction of property, trespass on property, or threats thereof. Andrews, however, was entitled to, and utilized, the grievance procedure available to him under his collective bargaining agreement. *See* 26 M.R.S.A. § 979–K (1988). He was also entitled to judicial review of the resolution of the grievance procedure. *Id.* § 979–M. These dispute resolution procedures, in my opinion, provided a constitutionally adequate remedy to Andrews for retaliation for engaging in protected speech. *See Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (refusing to recognize private cause of action under the First Amendment for federal employee whose free speech rights had been violated by his supervisors in light of extensive civil service remedies for unlawful employment practices).

[¶ 25] I do not concur, however, in the Court's conclusion that "reasonable public officials could disagree as to whether the defendants' conduct violated Andrews's First Amendment right," and I would deny a summary judgment for the individual defendants on the basis of qualified immunity.

[¶ 26] The Court, in a clear and concise manner, articulates the proper standard to be applied in cases alleging an interference with a public employee's First Amendment right to speak out on matters of public concern. Unfortunately, it then fails to apply the standard in any meaningful way. The Court determines simply that because the fact-based balancing test required in public employee free speech cases makes it difficult for public officials to determine whether an employee's rights were violated, reasonable public officials could disagree as to whether Andrews's rights were violated in *this* case. The facts of this case, however, fall so squarely within the parameters of *Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that I cannot agree that any reasonable public official

would have a question whether Andrews's letter to the *Maine Times* could be the subject of retaliation.

[¶ 27] In *Pickering* a public school teacher was dismissed from employment for writing and publishing a letter to the editor of his local newspaper that was highly critical of the board of education and the district superintendent of schools. *See id.* at 564, 88 S.Ct. 1731. In particular, Pickering objected to the board's allocation of school funds between educational and athletic programs, and to both the board's and the superintendent's handling of two bond issues and two proposed tax increases intended to benefit the schools. In applying its balancing test and concluding that Pickering's dismissal was impermissible, the Supreme Court held that Pickering's criticisms were valid subjects of public concern, did not impede the proper performance of his daily duties in the classroom, and did not interfere with the regular operation of the schools generally. *See id.* at 572–73, 88 S.Ct. 1731. I am not convinced that the circumstances surrounding Andrews's letter to the *Maine Times* are sufficiently distinct from those in *Pickering,* notwithstanding the defendants' claimed disruptions to their efficiency.

[¶ 28] The defendants' allegation that Andrews's letter had the *potential* to damage the DEP's reputation is pure speculation and is easily distinguishable from cases where courts have granted qualified immunity upon a showing of *actual* damage to a department's reputation with the general public. *See, e.g., Bartlett v. Fisher,* 972 F.2d 911, 917 (8th Cir.1992) (court presented with affidavit from police officer that described encounters with "belligerent" members of public as a result of fellow officer's letter alleging a ticket-writing quota system). A conclusory assertion that a public employee's otherwise protected speech *may* diminish his employer's reputation, without any evidence that it has done so, does not, as a matter of law, sufficiently outweigh the employee's right to speak on a matter of public concern. *See Powell v. Basham,* 921 F.2d 165, 168 (8th Cir.1990) (per curiam). *Any* speech that criticizes a governmental department necessarily has the potential to damage an

agency's reputation, but surely this mere potential cannot be sufficient to support disciplinary action against an employee, for if it was, the Supreme Court would have upheld the school board's dismissal of Pickering.[5]

[¶ 29] Moreover, the defendants' assertion that Andrews's letter threatened to interfere with the DEP's regular operations by angering the Legislature, which in turn would set limits on the DEP's responsibilities, aside from once again resting on speculation, is tenuous at best. In support of their contention, the defendants rely in part on the deposition of the president of the Maine Oil Dealers Association, Eugene Guilford. Guilford testified that he used the acrimonious meeting between the Knowltons and Andrews as an example to lobby the Legislature for restrictions on the DEP's authority. Guilford's and the Maine Oil Dealers Association's attempt to limit the authority of the DEP was its standard practice, however, and had nothing to do with the publication of Andrews's letter. Alan Prysunka, Andrews's supervisor, expressed his concern that the letter would cause the issue of the DEP's alleged shortcomings to remain in public focus. Even if Andrews's letter resulted in legislative action adverse to the DEP's interest, as alleged by the defendants, such legislative action cannot be characterized as the type of interference with the efficiency of the DEP that would outweigh an employee's right to speak out on an issue of public importance.

[¶ 30] The law has been clearly established since the Supreme Court's *Pickering* decision in 1968 that a public employee may not be disciplined for speaking out on a matter of public interest when that speech does no more than criticize generally his employer and does not directly interfere with the efficiency of the department for which he works. Because I believe that Andrews's conduct and its effect on the DEP is virtually

indistinguishable from the facts presented in *Pickering,* I conclude that the defendants are not entitled to qualified immunity, and I would allow Andrews's section 1983 claim for damages to go forward.

---

[5]. We recently determined that the First Amendment rights of a police sergeant who urged other officers to surreptitiously tape conversations with the Chief of Police were outweighed by the interest of the police department in providing effective and efficient law enforcement. *See Moen v. Town of Fairfield,* 1998 ME 135, 713 A.2d 321. We noted there that the sergeant's speech was not made in a public setting, did not relate to the department's responsibilities to the public, did not advance other public interests, and was motivated in part by private employment interests. *See id.* at ¶ 23. In contrast, Andrews wrote a letter to the editor of a local newspaper, discussed issues of public import regarding the DEP's responsibilities and raised general issues of public policy.