STATE OF MAINE                                    SUPERIOR COURT

Cumberland, ss.                                              Civil Action

STATE OF MAINE
Cumberland, ss. Clerk's Office

JUL 20 2018
2:23 pm.
RECEIVED

CONSERVATION LAW FOUNDATION

      Plaintiff

v.                                                    Docket No. CV-18-045

PAUL R. LePAGE, in his capacity as
Governor of the State of Maine

      Defendant

_____                                   CONSOLIDATED

MAINE RENEWABLE ENERGY ASSOCIATION

      Plaintiff

v.                                                    Docket No. CV-18-089

PAUL R. LePAGE, in his capacity as
Governor of the State of Maine

## ORDER ON PENDING MOTIONS

Before the court are the following motions:

- Defendant's Motion to Dismiss the complaint filed by Plaintiff Conservation

  Law Foundation (CLF)

- Defendant's Motion to Dismiss the complaint filed by Plaintiff Maine

  Renewable Energy Association (MREA) pursuant to M.R. Civ. P. 12(b)(1).

1

- Plaintiff MREA's Motion for Summary Judgment, joined in by Plaintiff CLF, and opposed by Defendant LePage, with a cross-motion for summary judgment in his favor.

Oral argument was held July 13, 2018.

## Background

### a. The parties

Conservation Law Foundation (CLF) is a regional non-profit organization dedicated to the conservation, management, and development of New England's natural resources. (CLF Compl. ¶ 5.) As part of its advocacy, CLF engages with attorneys and policymakers concerning the design and operation of New England's electric grid, energy efficiency, reducing greenhouse gas emissions, and the sustainable development of renewable energy sources. (CLF Compl. ¶ 6). CLF has also participated in task forces considering the impacts of wind energy development in Maine and potential development of renewable energy in the Gulf of Maine. (CLF Compl. ¶ 6.)

Plaintiff MREA is a Maine non-profit corporation that functions as a professional trade association of renewable power producers and suppliers, as well as supporters of the renewable power industry in Maine. (MREA Compl. ¶ 4.) As such, MREA actively advocates for renewable energy generation in Maine and participates in the development of Maine's renewable energy policy. (MREA Compl. ¶ 5.) MREA's membership of approximately 35 includes wind energy producers actively engaged in developing, or supporting the development, of wind energy projects.

Several MREA members intend to seek state permits for wind energy projects in areas of Maine within the scope of the Executive Order that has been challenged in these consolidated cases.

Defendant Paul R. LePage ("Governor LePage") has been Governor of the State of Maine since 2011. His current term is scheduled to expire when his successor takes the oath of office Wednesday, January 2, 2019. *See* Me. Const. art V, § 2.

b. Executive Order 2018-002

On January 24, 2018, Governor LePage issued Executive Order No. 2018-002. (CLF Compl. ¶ 48.) The Executive Order establishes the Maine Wind Energy Advisory Commission "for the purposes of (1) studying the economic impact of potential Wind turbines in the Areas, (2) Assessing the economic impact of expedited wind rules and procedures, (3) Assessing and developing recommendations in a written report." (CLF Compl. ¶ 49.) The "Areas" are defined as "the scenic vistas and pristine waters of Western Maine, our coast and coastal islands, and our significant avian migratory pathways . . . ." (CLF Compl. ¶ 51.)

The Executive Order calls for the Commission to "deliver a report summarizing its recommendations to the Governor when finished," but does not set a date or deadline for the delivery of the report. The Executive Order also says that the recommendations of the Commission are to be "formalized upon the approval of an Executive Committee," consisting of the commissioners of the Departments of Environmental Protection and Economic and Community Development, the director of the Governor's Energy Office, and other officials.

3

The provision of the Executive Order that has generated this litigation consists of the following single sentence: "I order that no permits related to wind turbines are issued in the Areas until the report is issued in writing." (CLF Compl. ¶50.)

c. The Plaintiffs' Claims

On January 30, 2018, CLF filed a complaint seeking a declaration that the Executive Order is void due to its contravention of the separation of powers doctrine as set forth in the Maine Constitution. (CLF Compl. ¶ 64.) Specifically, CLF asserts in its complaint that the Maine Legislature has occupied the field of wind power permitting, and that the Order conflicts with laws and policies enacted by the Legislature by purporting to order that no permits are to be issued until the Wind Energy Advisory Committee releases its report. (CLF Compl. ¶¶ 60, 63.)

MREA filed its complaint February 16, 2018. Its complaint makes similar assertions to those in the CLF complaint—that the Executive Order conflicts with duly enacted laws and policies governing the issuance of permits for wind turbine facilities. (MREA Compl. ¶¶ 44-45.)

Both complaints seek declaratory relief in the nature of a declaration that the Executive Order is unconstitutional because it usurps the Legislature's authority, and is therefore void. In addition, Plaintiff MREA's motion for summary judgment asserts that it is entitled to judgment as a matter of law on that issue. MREA's motion is supported by affidavits from its executive director and representatives of three MREA members that contend that the members have wind energy projects in the works that

4

are being harmed or threaten to be harmed by the Executive Order's moratorium on permits.

d. Governor LePage's Response

Through his counsel, Governor LePage has acknowledged that the Executive Order cannot override statutory provisions regarding the issuance of wind turbine permits. Current law provides for expedited review by the Maine Department of Environmental Protection (DEP) of grid-scale wind energy developments. *See* 35-A M.R.S. §§ 3451-59. A separate statute requires the DEP to issue a decision on a grid-scale wind energy development application within 185 days, except when the DEP Commissioner holds a public hearing, in which case, the deadline for decision is 270 days. *See* 38 M.R.S. § 344(2-A)(A)(1).

Governor LePage concedes that he has no constitutional or legal authority to override the statutory deadlines for action on wind energy permit applications by delaying the issuance of permits to wind energy projects that meet permitting requirements beyond those deadlines. However, he argues that the sentence at issue is "ambiguous" rather than illegal, because his intent was to delay the issuance of permits to the extent permitted by law, but not beyond that extent. If that was the intent, the court sees no reason why the Governor cannot direct that permits not be issued until either the issuance of the Commission report or until the statutory deadline for action on wind turbine permit applications, whichever comes first.

Governor LePage has submitted an affidavit from Steven McGrath, director of the Governor's Office of Energy Independence. Mr. McGrath's affidavit indicates that

5

he will serve as chair of the Commission established by the Executive Order and is in the process of convening an initial meeting of the Commission.

The obvious import of the McGrath affidavit is to suggest that the Commission's report will be issued without undue delay, although the affidavit does not predict any date by which the report will be issued.

Governor LePage has also submitted the affidavit of Mark Bergeron, director of the bureau within the DEP that handles applications for wind energy projects. Mr. Bergeron's affidavit says that none of the MREA members who claim that their projects have been harmed by the Executive Order has applied for a permit. The affidavit also says, in effect, that the bureau intends to ignore the plain meaning of the sentence in question, and will process applications for wind energy projects according to the applicable statutes, whether or not the Commission has issued its report.

*Discussion*

The sentence in the Executive Order that the Plaintiffs object to does not seem ambiguous—on its face, it appears to conflict with the DEP statute. Plaintiffs argue that, if the sentence does not accurately reflect the intent behind the Executive Order, what is at least an ambiguous, if not unlawful, provision should be clarified. Instead, Governor LePage has moved to dismiss MREA's and CLF's claims on several grounds.

Governor LePage advances three arguments in support of his motion to dismiss both of these actions: (1) the complaint in each fails to plead a cause of action, (2) the

6

Plaintiffs' allegations of harm are insufficient to show standing, and (3) there is no justiciable case or controversy that is ripe for adjudication.

Although presented as distinct arguments, the three asserted grounds for dismissal are in reality intertwined.

a. Cause of Action

Governor LePage contends that both Plaintiffs' complaints are deficient because they fail to aver the cause of action that Plaintiffs seek to litigate.

MREA's complaint does not contain any specific invocation of jurisdiction. It appears to be an action arising under the Maine Constitution and the Maine Declaratory Judgments Act. 14 M.R.S. §§ 5951 *et seq.* CLF's complaint does contain a specific averment as to jurisdiction—paragraph 3 asserts that the court has jurisdiction under the Maine Declaratory Judgments Act, 14 M.R.S. § 5953.

However, as Governor LePage's Motion to Dismiss asserts, the Maine Declaratory Judgments Act does not confer jurisdiction where jurisdiction would otherwise not exist. *See Colquhoun v. Webber,* 684 A.2d 405, 411 (Me. 1996).

In addition, to the extent the Plaintiffs are asserting private causes of action under the Maine Constitution as a basis for jurisdiction, Governor LePage points out that the Law Court has specifically limited "the available remedies for a violation of rights guaranteed by the Maine Constitution [to] those that the Legislature in its wisdom has provided"—namely the Maine Civil Rights Act, 5 M.R.S. §§ 4681 *et seq. Andrews v. Department of Environmental Protection,* 1998 ME 198, ¶ 23, 716 A.2d 212. Neither Plaintiff has invoked (and based on the language of the statute, could invoke)

7

the private right of action contained in the Act. *See* 5 M.R.S. § 4682.

In response to these arguments, Plaintiffs point to numerous Maine cases involving requests for declaratory judgment in which there is no particular reference to a statutory or constitutional basis for jurisdiction, and contend that these cases show that the only requisites for the court to assume jurisdiction over a claim for declaratory relief are a justiciable controversy and a party with standing.

In the context of this case, the court agrees with the Plaintiffs. The Superior Court is the court of general jurisdiction in the State of Maine. In the absence of any provision of law prescribing a different procedure or assigning jurisdiction to a different court,[1] what a party must show, in order to invoke the Superior Court's jurisdiction, is a justiciable controversy and standing to litigate it. *See Lund ex rel. Wilbur v. Pratt,* 308 A.2d 554, 559 (Me. 1973).

In determining whether an action presents a justiciable controversy, courts look to whether the action presents a claim based on an existing right and is brought by a party with standing to sue. *See Smith v. Allstate Insurance Co.,* 483 A.2d 344, 346 (Me. 1984) (a justiciable controversy is defined as "a claim of right, buttressed by a sufficiently substantial interest to warrant judicial intervention") (*quoting Berry v. Daigle,* 322 A.2d 320, 326 (Me. 1974)) *See also Connors v. International Harvester Credit Corp.,* 447 A.2d 822, 824 (Me. 1982) ("A justiciable controversy is a claim of present

---

[1] Rule 80B of the Maine Rules of Civil Procedure furnishes an example of a prescribed procedure that limits the availability of a declaratory judgment action. *See SOLD, Inc. v. Town of Gorham,* 2005 ME 24, ¶¶ 15-16, 868 A.2d 172 (developer's declaratory judgment action challenging municipal ordinance dismissed as untimely because it was commenced after the expiration of the Rule 80B deadline for appeal).

8

and fixed rights, as opposed to hypothetical or future rights, asserted by one party against another who has an interest in contesting the claim.")

Although the Declaratory Judgments Act would not confer jurisdiction in the absence of a justiciable controversy, "the declaratory judgment law may be used for certain anticipatory challenges to applications of state or local ordinances or administrative regulations so long as the other prerequisites of a justiciable controversy exist." *SOLD, Inc. v. Town of Gorham*, 2005 ME 24, ¶ 14, 868 A.2d 172.

Were the Plaintiffs challenging an agency rule, the Maine Administrative Procedure Act would dictate that they commence a declaratory judgment action in which they would have to demonstrate standing and the existence of a justiciable controversy. *See* 5 M.R.S. § 8058 ("Judicial review of an agency rule, or of an agency's refusal or failure to adopt a rule where the adoption of a rule is required by law, may be had by any person who is aggrieved in an action for declaratory judgment in the Superior Court . . .").

Both the Governor and the Legislature are expressly excluded from the scope of the Maine Administrative Procedure Act. *See id.* § 8002(2). However, this does not change the nature of the remedy available for challenging acts of the Governor or the Legislature.

Accordingly, the court concludes that the Plaintiffs do not need to identify a cause of action beyond what their complaints indicate, and that the real questions here are whether these cases present a justiciable controversy and whether they are brought by plaintiffs with standing.

9

b. <u>Justiciable Controversy</u>

The jurisdictional elements of a justiciable controversy and standing are distinct—a civil action may well raise a concrete dispute amenable to adjudication, but the party raising it in the court may not have a sufficient stake or interest in the dispute to warrant the court accepting jurisdiction of the action.

Governor LePage's argument that these cases do not present a justiciable controversy rests in part on his contention that the Executive Order does not mean what it appears to say. Although the sentence at issue purports to impose a moratorium on permits on wind turbine projects that could last beyond the statutory deadline for the DEP to act on permit applications, the Governor says the intent was otherwise.

Instead of clarifying the Executive Order to reflect its true intent, the Governor has submitted the affidavit of Mr. Bergeron to the effect that the DEP intends to disregard the plain meaning of the sentence at issue and intends to act on wind turbine permits by the statutory deadlines, whether or not the Commission has issued its report.

In the court's view, Mr. Bergeron's affidavit does not render the controversy non-justiciable. The DEP Commissioner, acting with or without a directive from the Governor, could countermand Mr. Bergeron's interpretation of the Executive Order at any time.

Even more to the point, Mr. Bergeron's stated intention to act on permits by the statutory deadlines is not binding on any opponent of a proposed wind energy

10

project. An opponent could still argue that the Executive Order should be construed the way Plaintiffs construe it—that it prohibits any permit from being issued before the Commission issues its report, regardless of the statutory deadlines. Were the DEP to issue a permit to a wind turbine applicant before the issuance of the Commission report, an opponent could appeal to the courts on the ground that the Executive Order bars the issuance of the permit.

The Governor's argument that there is no justiciable controversy also rests on lack of ripeness—he points out that the Commission may issue its report before any application for wind permits reaches the point at which it must be acted upon, so any impact of the moratorium on the Executive Order on a permit applicant is purely speculative and hypothetical.

However, the Executive Order does not appear to contemplate a speedily issued report, to say the least. It directs the Commission to engage in a variety of tasks in order to develop its recommendations, and the recommendations have to be "formalized" by yet another group—the Executive Committee—before the recommendations can be sent to the Governor. About six months have already passed since the Executive Order was issued and the Commission has evidently not had its first meeting yet.

The record is silent as to whether there are any wind turbine project applications now pending before the DEP. (The Bergeron affidavit speaks only to the absence of applications by the MREA members that claim their planned projects are being harmed). But if there were such a pending application, and if the statutory

11

deadlines for the DEP to act on the application were coming up, those circumstances, plus the fact that it appears no Commission report will be issued anytime very soon, would likely be sufficient to generate a justiciable controversy that the permit applicant could litigate, before the DEP and in the courts.

It is only because neither the Plaintiffs nor their members have wind energy permit applications pending before the DEP that would give them standing to litigate that controversy that the existence of a justiciable controversy is in question.

Thus, the issues raised in the pending motions and oppositions seem to boil down to a question of the Plaintiffs' standing—Do the Plaintiffs have a sufficient existing stake in the conflict between the wording of the Executive Order and wording of the DEP statute to be able to litigate it?

c. Standing

Maine's "standing jurisprudence is prudential, rather than constitutional." *Roop v. City of Belfast*, 2007 ME 32, ¶ 7, 915 A.2d 966 (2007) (quotation omitted). "The gist of the question of standing is whether the party seeking review has a sufficient personal stake in a justiciable controversy to assure the existence of that concrete adverseness that facilitates diligent development of the legal issues presented." *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1380 (Me. 1996) (internal quotes omitted).

"To determine whether a party has standing, courts look to the gravamen of a parties' complaint. *Roy v. Augusta*, 414 A.2d 215, 217 (Me. 1980) (citing *Walsh v. Brewer*, 315 A.3d 200, 205 (Me. 1974)).

12

In their complaints, CLF and MREA allege that the Governor has usurped the authority of the legislature and thus acted in contravention of the separation of powers clause of the Maine Constitution. Both complaints seek vindication for a public wrong. *See Heald v. School Administrative Dist.*, 387 A.2d 1, 4 (Me. 1978) (citing *Baker v. Carr*, 369 U.S. 186, 208 (1962) (stating that the operation of the government in accordance with the law is a public right possessed by every citizen of the state)).

However, in order to obtain judicial review of a public wrong, a potential plaintiff must have suffered a direct and personal injury that is distinct from that suffered by the public at large. *See id* at 3; *Buck v. Town of Yarmouth*, 402 A.2d 860, 861 (Me. 1979) ("[A]n individual citizen who suffers no particularized injury from a public wrong cannot seek relief from the courts."); *see also Lindemann* v. *Commission on Governmental Ethics & Election Practices*, 2008 ME 187, ¶ 15, 961 A.2d 538. "A mere 'interest in a problem' . . . is not sufficient by itself" to confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

Generally, persons engaged in a business that is directly affected by government action have standing to challenge the validity of that action. *James v. Town of West Bath*, 437 A.2d 863, 865 (Me. 1981); *see also Halfway House*, 670 A.2d at 1381 (stating that case law has held that the prospect of economic injury is sufficient to confer standing). However, the prospect of injury must be sufficiently concrete and definite; a tenuous, hypothetical or indirect injury will not suffice. *See Varney v. Look*, 377 A.2d 81, 83 (Me. 1977); *see also In re Pittston Co. Oil Refinery & Marine Terminal*, 375 A.2d 530, 533 (Me. 1977).

These consolidated cases are brought by two associations that have differing missions and memberships, but share a commitment to promoting renewable energy. CLF and MREA appear to assert that they have standing in their own right due to their continuing and significant participation in the development of renewable energy policy in Maine. In this court's view, while their roles clearly might entitle them to intervene or otherwise participate in legislative and administrative proceedings of various kinds, neither association has demonstrated that it stands to suffer the direct and concrete effects of a moratorium in the issuance of permits to wind energy projects necessary to confer standing to sue.

However, both Plaintiffs also assert that they have associational standing, i.e. standing by virtue of representing members who have suffered direct and concrete injury, and this is a firmer foundation on which both Plaintiffs to stand. Such representational standing exists where an association "allege[s] that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

CLF's complaint at paragraph 7 asserts that the moratorium on permits contained in the Executive Order "will harm a variety of interests held by CLF members, including their economic, public health, aesthetic and professional interests. Defendant's Executive Order also harms CLF members' constitutional interests in preserving the separation of powers" among branches of government."

14

In support of its opposition to Defendant's motion, CLF has provided affidavits of two of its members, Philip Conkling and Phil Coupe. The Conkling affidavit asserts that Mr. Conkling is personally aware of several wind power developers who have suspended development of their work. (Conkling Aff. ¶ 11.) Mr. Conkling's affidavit further asserts that the Governor's Order has a direct impact on both the consulting work that he performs for proponents of renewable energy projects and his personal interests in wind resource development, clean electricity, and the proper functioning of state government. (Conkling Aff. ¶¶ 12-14.)

The Coupe affidavit asserts that Mr. Coupe is a solar energy installer and servicer who is working on blending large community and commercial solar arrays with wind power projects. (Coupe Aff. ¶¶ 5, 8.) Because of the Governor's Order, Mr. Coupe contends he will not be able to co-locate or blend his solar arrays with new wind power projects. (Coupe Aff. ¶ 11.) Mr. Coupe is also concerned about the harmful impact the order has on his interests in seeing Maine meet its renewable energy goals as well as his children's ability to breathe clean air and access natural resources. (Coupe Aff. ¶¶ 11, 13.). Mr. Coupe is further concerned about the potential for the governor to issue a moratorium on future solar development. (Coupe Aff. ¶ 12.)

Neither of these affidavits asserts the kind of direct and concrete harm or injury resulting from the Executive Order that would be sufficient to confer standing upon Mr. Conkling and Mr. Coupe, and associationally upon CLF. Neither Mr. Conkling nor Mr. Coupe avers that he has applied—or will apply—for a wind energy project permit that could be delayed as a result of the Executive Order. While Mr. Coupe

15

does assert that a permitting delay will prevent him from co-locating his arrays alongside new wind farms, he does not assert that the Executive Order will prevent him from continuing his business or cause his business direct, concrete harm.[2] *See In re Pittston Co.*, 375 A.2d at 533.

Mr. Conkling's affidavit is similarly indirect in its assertion of economic harm to his business. As with Mr. Coupe's business, any harm to Mr. Conkling's business would only be the indirect result of a third-party's inability to obtain a permit. *See Collins v. State*, 2000 ME 85, ¶ 7, 750 A.2d 1257.

In addition to economic injury, CLF also argues that its members have suffered non-economic injury resulting from harm to the environment caused by a moratorium on wind development. To support its argument, plaintiff cites to *Fitzgerald v. Baxter State Park Authority*, 385 A.2d 189 (Me. 1978). In *Fitzgerald*, the Law Court held that five plaintiffs who were substantial users of Baxter State Park and who intended to use the park substantially in the future had standing to obtain judicial review of a program restoring areas of timber blow-down in the park despite the fact that they had not suffered any economic injury. *Id.* at 191, 197.

In contrast to *Fitzgerald*, this case does not involve governmental action affecting an existing resource like Baxter State Park. The Executive Order has no impact on existing wind energy facilities. This distinction is important. Whereas in *Fitzgerald*, the plaintiffs could assert that, as actual users of the park, they would be

---

[2] Additionally, there is no reason to believe, and Mr. Coupe does not aver, that the Order inhibits his ability to co-locate solar arrays at existing wind power sites.

16

affected by the challenged program in a way different from the general public, the Executive Order's moratorium on wind energy permits affects the general public in the same way it does the members of CLF. Due to their interest and involvement in renewable energy, CLF members may be more concerned than the general public about the effect of a moratorium on wind energy permits, but the effect—the alleged harm—is the same. *Cf. Sierra Club*, 405 U.S. at 739-40 ("[i]f any group with a bona fide "special interest" [in the conservation of natural resources] could initiate . . . litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.") Thus, for the court to find that all members of CLF have standing would be to disregard the requirement of a particularized injury. *See id.* at 736; *see also Fitzgerald*, 385 A.2d at 196-197; *Buck*, 402 A.2d at 861; *Collins*, 2000 ME 85, ¶ 7, 750 A.2d 1257.

Because CLF has not asserted or shown that its members have suffered any particularized injury, either economic or non-economic, CLF has not shown that it has standing to litigate this matter. *See Warth*, 422 U.S at 511.

MREA has, in theory, a better claim to standing simply because some MREA members are in the business of operating wind energy facilities. In fact, MREA has submitted affidavits indicating that three of its members will be applying for the very permits that the Executive Order addresses and thus could be directly affected by a delay in issuance of permits in a manner different from the effect on the general public.

MREA does not allege that any of its members has a pending application for a wind energy permit, but that does not necessarily preclude MREA from having

17

representational standing to challenge the Executive Order. This is made clear in the Law Court's *Halfway House, Inc. v. City of Portland* decision. 670 A.2d 1377 (Me. 1996).

In that case, a pre-release facility was determined to have standing to challenge a city ordinance that would prevent any expansion of the facility, even though it had no pending application to expand and had not acquired any property for purposes of expansion. *Id.* at 1381. The Law Court said:

> [R]ight, title or interest in affected property, is simply one, and not the exclusive means of establishing a standing to sue in litigation involving exclusionary zoning ordinances. Restricting standing in exclusionary zoning cases to only those parties with a possessory interest in property affected by the ordinance would present excluded groups with a "Catch 22" situation: the more severely and successfully exclusionary a challenged ordinance is, the more difficult it would be for an excluded group to establish standing. In this case, while lacking "right, title or interest" in a particular piece of property impacted by the amended ordinance, Pharos House still has standing to sue as a result of the direct affect [sic] the amended ordinance will have on its ability to expand its business in Portland.

*Id.*

Similarly, in *SOLD, Inc. v. Town of Gorham*, the Law Court observed, "The declaratory judgment law does permit anticipatory challenges to a regulation or ordinance to resolve a dispute regarding a planned action, before the matter actually proceeds and the challenged ordinance is applied to the detriment of the plaintiffs. Such anticipatory challenges pursuant to the declaratory judgment law have been allowed to seek clarification of the applicability of laws, ordinances, and administrative regulations to impending projects." 2005 ME 24, ¶ 14, 868 A.2d 172.

18

By analogy, even though MREA does not assert that any of its members have filed permit applications with the DEP that would be affected by the moratorium contained in the Executive Order, a showing that the Executive Order has had or will have a concrete adverse impact on the members' "impending projects," to use the Law Court's term, could be sufficient to confer standing on them, and through them upon MREA.

In the context of this case, to have standing, MREA has to allege and show that the effect of the Executive Order will more likely than not be to delay the issuance of permits for its members' projects beyond the statutory deadlines for the DEP to act on the yet-to-be filed applications. The delay itself need not have occurred, but it must be threatened.

However, MREA's complaint lacks any specificity about what stage its members' wind energy projects have reached in development or about what impact the Executive Order has had on its members' projects. The pertinent allegations are contained at paragraphs 8 and 9 of the MREA complaint. Paragraph 9 is insufficient because it asserts that MREA and its members have the same interest in preserving the separation of powers between the executive and legislative branches that all citizens and residents of Maine do. Paragraph 8 is insufficient because its allegations of the impact of the Executive Order on MREA and its members are vague and conclusory.

Governor LePage points out that, even construed on its face, the Executive Order will not necessarily delay any wind energy permit beyond the statutory

19

deadlines. He points out that, since MREA does not allege that any of its members has a pending application, the moratorium on issuance of permits would have to last for at least six months from whenever an application is filed in order to extend beyond the statutory deadlines. He notes that his term as Governor expires in January 2019 and that his successor may or may not maintain the Executive Order. The farther away MREA's members are from filing their permit applications, the more speculative and indefinite the effect of the Executive Order on their projects becomes.

To support its claim of standing, MREA has submitted four affidavits—those of its executive director, Jeremy Payne, and of representatives of three MREA members: Paul Williamson of Apex Energy; Aaron Svedlow of NextEra Energy Resources, and Masahiro Ogiso of Trireme Energy Development II, LLC.

The three member affidavits are similar in that all three assert that the companies they represent are developing wind energy projects that will at some point in the future require permits from DEP. Each of the member affidavits asserts that the moratorium on permits contained in the Executive Order "jeopardizes" the projects and "harms" the development of the member's projects in unspecified ways.[3] None of the affidavits says that the MREA member has already filed an application for a permit. None of the affidavits contains a specific description of what harm is

---

[3] All three affidavits also assert that the affiants' companies do not want to incur the expense and risk of preparing a permit application if the DEP cannot issue a permit due to the Executive Order or deny the permit based on the moratorium. This assertion begs the question of how the moratorium in the Executive Order threatens to cause permits for the companies' projects to be delayed beyond the statutory deadlines.

20

caused—or threatened—to the proposed project by the moratorium. None of the affidavits indicates how close the affiant's project is to the application and permitting stage, such that the approval of a permit would likely be delayed by a temporary moratorium on permitting.

Moreover, it is not the affidavits submitted by CLF and MREA that are the focus in determining their standing for purposes of a motion to dismiss. It is the allegations of the complaints that determine standing for purposes of a Rule 12(b)(6) motion. *See National Hearing Aid Centers, Inc. v. Smith*, 376 A.2d 456, 458 (Me. 1977) ("In determining justiciability we must ascertain whether the complaint alleged a claim of right justifying relief and whether a sufficiently substantial interest is asserted to warrant judicial protection.").

Governor LePage contends that both complaints are too vague and conclusory in their assertions of harm due to the Executive Order to be deemed sufficient to establish standing. He also contends that, even if the affidavits were deemed to be incorporated into the complaints, they are still insufficient to show that the Executive Order has caused or threatened the concrete adverse impact—the injury in fact— that is necessary to confer standing upon Plaintiffs or their members. The court agrees.

The court cannot issue an advisory opinion on the validity of the Executive Order at the request of a party who possibly might be affected by it. Neither complaint, even construed liberally, alleges the kind of direct, concrete actual or imminent adverse impact that is necessary for standing.

21

Conclusory allegations of standing may suffice when the adverse impact on the plaintiff is self-evident. The Law Court has on occasion deemed conclusory allegations sufficient. *See National Hearing Aid Centers, Inc. v. Smith*, 376 A.2d 456, 458 (Me. 1977).

However, the difference between *National Hearing Aid Centers, Inc.* and these cases is that the plaintiff in *National Hearing Aid Centers, Inc.* alleged that the newly enacted statute directly threatened to harm its existing business operations, whereas Plaintiffs in these cases allege that the Executive Order is harming their ability to obtain yet-to-be-sought permits for non-existent facilities that are at unspecified stages of planning. Arguably the need for specificity in a complaint's allegations regarding standing is higher when the alleged threatened or actual harm is to a concept or plan rather than to an existing resource, project or business.

In addition, when a plaintiff seeks judicial review of an executive or legislative act, the need to maintain the separation of powers among the three branches of government makes it essential that the plaintiff allege and show actual or threatened harm. In *Lewis v. Casey*, Justice Scalia, writing for the Court, said:

> The requirement [to] show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

518 U.S. 343, 349 (1996) (internal citations omitted).

For these reasons, the court deems the complaints in both of these cases to be insufficient to show that the Plaintiffs have standing, either in their own right or associationally through their members.

In its *National Hearing Aid Centers, Inc.* decision, the Law Court addressed the effect of conclusory allegations of standing in a complaint:

> Although the complaint does not allege in nonconclusory form the specific injury that will result, the complaint cannot be fatally defective on that basis alone. A complaint is sufficient to withstand a 12(b)(6) motion to dismiss if from a liberal construction of the pleadings *and possible amendments* thereto, the court can determine that a plaintiff can prove a set of facts to support his claim.

376 A.2d at 459 (emphasis added).

At oral argument, the court inquired about whether a supplementation of the current record on the issue of standing was requested, and understood that it was not. However, to avoid any uncertainty, the court will extend to both Plaintiffs the opportunity to seek leave to amend their respective complaints to address the areas identified in this Order.

Specifically, MREA may seek leave to file an amended complaint that alleges a set of facts indicating how the moratorium contained in the Executive Order has caused an actual injury in fact or threatens an imminent injury to any wind energy project being developed by its members.

The court is in doubt as to whether any proposed amendment by CLF will be sufficient, given that neither it nor any of its members is asserted to be in the business of wind energy projects and therefore can claim to be more than indirectly affected by

23

the Executive Order. However, CLF as well may seek leave to amend, provided that the allegations in the proposed amended complaint must be sufficient to address the areas identified in this Order.

IT IS HEREBY ORDERED AS FOLLOWS:

1. Defendant's Motion to Dismiss the complaint of Conservation Law Foundation is hereby granted.

2. Defendant's Motion to Dismiss the complaint of Maine Renewable Energy Association is hereby granted.

3. The Motion for Summary Judgment of Maine Renewable Energy Association is hereby denied without prejudice.

4. Plaintiff Conservation Law Foundation's Motion to Join Maine Renewable Energy Association's Motion for Summary Judgment is dismissed as moot.

5. Plaintiff Conservation Law Foundation may file a motion for leave to amend, attaching the proposed amended complaint, within 30 days of this Order. Additionally or alternatively, CLF may file a motion to participate as an amicus curiae in the MREA action within 30 days of this Order.

6. Plaintiff Maine Renewable Energy Association may file a motion for leave to amend, attaching the proposed amended complaint, within 30 days of this Order.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated July 20, 2018

A. M. Horton, Justice

Entered on the Docket: 7·20·18

24

CFL & MREA vs. LePage, PORSC-CV-2018-45 (consolidated with CV-18-89)

**Plaintiffs' Counsel:**

CLF:
Phelps Turner, Esq. – Lead
Sean Mahoney, Esq.
Emily Green, Esq.

MREA:
Kevin Decker, Esq. – Lead
Katherine Joyce, Esq.

**Defendant's Counsel:**

Gerald Reid, AAG – Lead
Susan Herman, AAG
Margaret Bensinger, AAG